**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Yerko Antonio MOLINA, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 17, 2006.
Filed April 6, 2006.

Darrell C. Dethlefs, Camp Hill, for appellant.

Jaime M. Keating, Assistant District Attorney, Carlisle, for Commonwealth, appellee.

BEFORE: STEVENS, BENDER, and KELLY, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the order entered in the Court of Common Pleas of Cumberland County denying Appellant's first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9543–9546. Appellant's sole issue on appeal is that trial counsel was ineffective in permitting evidence of Appellant's illegal immigration status and alias to be heard by the jury. We affirm.

¶ 2 The relevant facts and procedural history are as follows. On December 18, 2003, Appellant forced his wife's vehicle off the road and repeatedly stabbed her with a butcher knife. Represented by Gregory Abeln, Esquire, Appellant proceeded to a jury trial on September 1, 2004, and he was convicted of attempted murder, 18 Pa.C.S.A. § 2501, aggravated assault, 18 Pa.C.S.A. § 2702, simple assault, 18 Pa. C.S.A. § 2701, and recklessly endangering another person, 18 Pa.C.S.A. § 2705. Appellant was found not guilty with regard to the charge of drivers required to be licensed, 75 Pa.C.S.A. § 1501. On October 6, 2004, Appellant was sentenced to an aggregate of nine and one-half years to twenty years in prison; however, on October 11, 2004, upon agreement of the parties, the trial court modified Appellant's

sentence to an aggregate of eight and one-half years to eighteen years in prison.

¶ 3 On October 13, 2004, Appellant filed a timely post-sentence motion, and on January 28, 2005, the trial court modified Appellant's sentence to an aggregate of eight and one-half years to seventeen years in prison. No direct appeal to this Court followed; however, on February 16, 2005, Appellant filed a timely *pro se* PCRA petition. On June 2, 2005, represented by Robert J. Daniels, Esquire, Appellant proceeded to a PCRA hearing, and by order filed on June 2, 2005, the PCRA court denied Appellant relief under the PCRA. This timely appeal followed, and on July 7, 2005, the PCRA court ordered Appellant to file a Pa.R.A.P.1925(b) statement. Appellant filed a timely Pa.R.A.P.1925(b) statement, and the PCRA court filed an opinion.

¶ 4 Appellant contends trial counsel was ineffective in permitting evidence of Appellant's illegal immigration status and alias to be heard by the jury.

■ ¶ 5 In reviewing the propriety of the PCRA court's order denying a petition for post-conviction relief, we are limited to determining whether the court's findings are supported by the record and whether the order in question is free of legal error. *Commonwealth v. Halley*, 582 Pa. 164, 870 A.2d 795 (2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *See id.*

> In order to prevail on an ineffectiveness claim,...Appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for the course of conduct in question; and (3) he suffered prejudice as a result of counsel's ineffectiveness, i.e., there is a reasonable probability that but for counsel's act or omission in question, the outcome of the proceeding would have been different.

*Commonwealth v. Spencer*, 892 A.2d 840, 842 (Pa.Super.2006).

¶ 6 Appellant specifically takes issue with the following portions of the notes of testimony from his jury trial:

**Prosecutor:** And when you met him [Appellant], what name was he using?

**The victim:** Samuel Feliciano (phonetic).

\* \* \* \* \* \*

**Prosecutor:** Did you know anything or had he told you anything about his citizenship or immigration status at that point?

**The victim:** Not really. We really didn't talk about it. It really wasn't anything to worry about.

\* \* \* \* \* \*

**Prosecutor:** Now in late 2002, did something happen with regard to the Defendant's immigration status?

**The victim:** He wanted to go to—he had lost his job at Ross for attendance; and I was working. And he wanted to go to a car show in Canada with some of our friends. And I took off work, and we made a road trip to Canada.

**Prosecutor:** Okay. And what happened then?

**The victim:** We got to Canada. And they asked for our ID in Canada. And I gave them mine and everything, and he was really starting to worry saying that it wasn't going to work, his ID, that he should have brought his other one. And they said they couldn't accept him. We got in, and he was in the offices for awhile saying they couldn't find information about him and then turned us around. And we came back to the U.S. And then that's when they detained him.

**Prosecutor:** And so he was detained and taken away from you then?

**The victim:** Yeah. I was sitting in the waiting room for hours.

**Prosecutor:** What did you do then?

**The victim:** I just pretty much sat there, and then someone came out and said he wants to talk to you. And I went back, and he was crying. And he said, you know, I'm illegal; and they're going to send me back to Chile. And the officer was saying something about, you know, if we would get married, you know, he could stay. And then—I said, Should I go home? And he said, No. Just stay in a hotel and see if you can contact me.

N.T. 9/1/04 at 73, 75–77 (the victim on direct examination) (emphasis added).

**Defense Attorney:** Now, when you went to Canada that time, to go to Canada—an attempt to go to Canada, and he was detained?

**The victim:** Uh-huh.

**Defense Attorney:** Alright. That's when you went to the motel to wait to see what was going to happen?

**The victim:** Correct.

Defense Attorney: Then you met with an attorney at some point after that to figure out what his immigration status was going to be?

The victim: Correct.

**Defense Attorney:** Whether he was going to be deported?

**The victim:** Correct.

**Defense Attorney:** Isn't it a fact that he told you that maybe it would not be a good idea to get married because it would be too complicated for you?

**The victim:** That is not—that's not right.

**Defense Attorney:** And isn't it true that he indicated when—that you told the lawyer you would marry him?

**The victim:** That's not right. We both decided to get married.

**Defense Attorney:** And that was not your idea entirely?

**The victim:** Not entirely. We both— we both agreed on it.

**Defense Attorney:** Ultimately, right?

**The victim:** Yes.

**Defense Attorney:** And that was after discussion of not getting married?

**The victim:** We had always discussed about getting married. Whenever I was in that room with him before they took him away to jail in Canada, he said, if we got married, I could stay here. That's what he said to me.

**Defense Attorney:** So when you came back and you got married, you got married here in Mechanicsburg?

**The victim:** Yes.

N.T. 9/1/04 at 104–105 (the victim on cross-examination) (emphasis added).

**Defense Attorney:** Okay. [Y]ou heard [the victim] take the stand and testify about your relationship?

**Appellant:** Yes.

**Defense Attorney:** And she indicated that you were—you told her your name was Samuel Feliciano?

**Appellant:** Yes.

**Defense Attorney:** Okay. Would you explain to the jury what that's all about?

**Appellant:** Well, unfortunately, I'm not legal yet in this country. So I needed social security to work or, like, have a really good job. And when I was living in New York, I got the opportunity to get paper for—somebody was selling papers so I can work. So I got those papers, and I started working with that name for a short period of time. And that's pretty much what I was under that name.

\* \* \* \* \* \*

**Defense Attorney:** When you moved in together, did you pool your resources, meaning your money? Did you split your money and your costs?

Appellant: Yeah, of course. And actually, I was giving my paycheck to her. And even like that time that I was being held for INS, I still had a paycheck; and she said—she told me on the phone—I was talking to her on the phone. And she said she got my paycheck.

There was like probably 7, $800. And I said, well, cash it and do whatever you want with the money, I mean, because she was telling me that she needed to pay the rent and all that kind of stuff.

I said, well, use the money for that. And I even tell [*sic*] her to use the money that my dad sent to her to pay my bail too, you know, the custody. And she was—I told her—say if you need money, just use the money. I can wait.

N.T. 9/1/04 at 183–184, 187–188 (Appellant on direct examination) (emphasis added).

Prosecutor: Okay. When you came to this country, you had permission to stay for six months, right?

Appellant: Yeah.

Prosecutor: That was in 1995?

Appellant: Yes.

Prosecutor: You're still here?

Appellant: Yep. That thing don't have nothing [*sic*] to do with this.

Prosecutor: That's for the jury to decide.

THE COURT: [Mr. Prosecutor.] Do not make any more statements like that. You are to ask questions. You know better as [defense counsel] knows better. I will [have] none of that in my courtroom.

Prosecutor: Very, well, Your Honor.

Prosecutor: Sometime thereafter, you purchased an identification card in someone else's name?

Appellant: Uh-huh.

Prosecutor: The person whose card you purchased, you don't know that person?

Appellant: No.

Prosecutor: That's not your name, Samuel Feliciano?

Appellant: No.

N.T. 9/1/04 at 219–220 (Appellant on cross-examination) (emphasis added).

¶ 7 Appellant avers that all of the aforementioned references to his illegal immigration status and use of an alias in connection therewith were improper, and, therefore, trial counsel was ineffective in failing to object and/or questioning Appellant and the victim.

¶ 8 Regarding the first prong of the ineffectiveness test, defense counsel testified that he believed the evidence concerning Appellant's alias and immigration status were relevant because Appellant had been charged with a violation of 75 Pa.C.S.A. § 1501, drivers required to be licensed.[1] Moreover, regarding Appellant's argument the references constituted improper evidence of prior bad acts, we note that:

It is axiomatic that evidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes. This rule is not without exception, however. Evidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character. It is well-established that reference to prior criminal activity of the accused may be introduced where relevant to some purpose other than demonstrating defendant's general criminal propensity. Thus evidence of other crimes may be intro-

---

1. Section 1501 provides, in relevant part, "[n]o person, except those expressly exempted, shall drive any motor vehicle upon a high-way or public property in this Commonwealth unless the person has a driver's license valid under the provisions of this chapter."

duced...in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development.

*Commonwealth v. Melendez–Rodriguez,* 856 A.2d 1278, 1283 (Pa.Super.2004) (quotation omitted).

¶ 9 In the case *sub judice,* the reference to Appellant's illegal immigration status and use of an alias formed the history of the relationship between the parties. In particular, the defense contended at trial that the victim had all of the power in this country, she was the aggressor, and she became violent when Appellant was going to leave the United States. The Commonwealth, on the other hand, contended Appellant married the victim only so that he could stay in the United States legally and he was the aggressor when the victim was going to divorce Appellant. Therefore, Appellant's immigration status and use of an alias was properly admitted at trial and there is no arguable merit to the underlying claim.

¶ 10 Regarding the second prong of the ineffectiveness test, defense counsel testified at the PCRA hearing that his theory of the case was that the victim was the aggressor and the victim "loved the [d]efendant so much she didn't want to let him go." N.T. 6/2/05 at 15. Defense counsel indicated that the evidence concerning Appellant's immigration status was used by the defense to show the victim went to great lengths to keep Appellant in this country because she was possessive and she had the control in the relationship. N.T. 6/2/05 at 15–16. Therefore, defense counsel had a reasonable basis for his course of conduct.

¶ 11 Finally, regarding the third prong of the ineffectiveness test, we conclude there is no reasonable probability that but for counsel's act or omission in question the outcome of the proceedings would have been different. *See Commonwealth v. Sanchez,* 407 Pa.Super. 234, 595 A.2d 617 (1991) (holding that references to defendant as an "illegal alien" were inadmissible; however, the error was harmless on direct appeal). There was overwhelming evidence of Appellant's guilt presented at trial. *See Commonwealth v. Saranchak,* 581 Pa. 490, 866 A.2d 292 (2005) (holding that where evidence of guilt was overwhelming trial counsel's ineffectiveness failed the prejudice prong).

¶ 12 For instance, Robert Yost, Jr. testified he is a fireman and responded to the scene of the instant attack. N.T. 9/1/04 at 17. Upon arrival, he saw a man, later identified as Appellant, lying face-down completely on top of the victim, who was lying on her back. N.T. 9/1/04 at 19. Mr. Yost could only see the victim's face at this point. N.T. 9/1/04 at 26. He also noticed "blood all over the place" and a knife on the floorboard of the front passenger side area. N.T. 9/1/04 at 19–20. David W. Bobb, a volunteer firefighter, described the scene in a substantially similar manner as Mr. Yost.

¶ 13 William K. Stum, a firefighter, testified he saw Appellant lying on top of the victim in the vehicle and was concerned because Appellant's hand was close to the knife. N.T. 9/1/04 at 44–45. Mr. Stum testified the victim's eyes were open and blinking; however, Appellant was not moving. N.T. 9/1/04 at 50.

¶ 14 Christopher James Darhower, a volunteer firefighter, testified to the position of Appellant and the victim in a substantially similar manner as the other firefighters. Mr. Darhower added that when the victim was removed from the car she had a deep slash down the length of her throat and she whispered that she could not breathe. N.T. 9/1/04 at 57–58. He also noticed cuts on her chest, deep lacerations under both armpits, a slashed right

wrist, and some of her fingers were nearly amputated. N.T. 9/1/04 at 58–60. Mr. Darhower testified the victim had lost so much blood that she was in shock and had "pretty much bled out." N.T. 9/1/04 at 60. Once they were in the ambulance, Mr. Darhower asked the victim what had happened, and she indicated that her husband had stabbed her. N.T. 9/1/04 at 61. In response to questioning, the victim indicated that her husband was the man in the vehicle. N.T. 9/1/04 at 61.

¶ 15 The victim, who was twenty-one years old, testified she is married to Appellant, whom she met at work. N.T. 9/1/04 at 73. She indicated that, near the end of 2003, the victim "fell out of love" with Appellant because Appellant was never home and contributed no money for the bills. N.T. 9/1/04 at 81–83. Sometime prior to December 18, 2003, the victim told Appellant to move out of their home, and she told him she was seeing somebody else. N.T. 9/1/04 at 83. Appellant became enraged. N.T. 9/1/04 at 83. On December 18, 2003, Appellant spoke to the victim at their residence, and she told him she did not want to reunite. N.T. 9/1/04 at 85. Appellant left and a short time later the victim left for work. N.T. 9/1/04 at 86. The victim testified that, approximately five miles from her house, Appellant used his car to push the victim's car off of the road. N.T. 9/1/04 at 87. Appellant opened the driver's side door and slashed the victim's neck. N.T. 9/1/04 at 88. The victim became frightened and apologized for the couple's problems. N.T. 9/1/04 at 88. Appellant continued to stab the victim and then he stabbed himself in the neck and stomach and cut his wrist. N.T. 9/1/04 at 89. The victim testified she never held the knife, never stabbed herself, and never stabbed Appellant. N.T. 9/1/04 at 90.

¶ 16 Pennsylvania State Police Trooper Roger Hall testified the police seized a Dollar General Store sales receipt from Appellant's vehicle. The receipt was dated December 18, 2003, and listed the purchase of forks, chef knives, and fudge marshmallow. N.T. 9/1/04 at 123. Trooper Hall testified he interviewed Appellant at the hospital following the incident, and Appellant told him he had visited the victim on December 18, 2003, and then went to the Dollar General Store. N.T. 9/1/04 at 124.

¶ 17 Robert Cherry, M.D., testified he treated the victim on December 18, 2003. He read from a December 22, 2003 medical report, which indicated that Appellant told hospital personnel he wanted to speak to his wife about getting back together, he was depressed when his wife left him for another man, and he told his wife to kill him. N.T. 9/1/04 at 149–150.

¶ 18 Pennsylvania State Police Trooper Robert C. Clark testified he works for the forensics unit and he tested the knife used in this case. N.T. 9/1/04 at 154. He found on the knife a latent palm print, which matched the palm print of Appellant. N.T. 9/1/04 at 156–159, 163.

¶ 19 In light of the overwhelming evidence, we conclude Appellant has not met the prejudice prong of the ineffective assistance of counsel test.

¶ 20 Affirmed.