COMMONWEALTH of Pennsylvania,
Appellee

v.

Bakary KOUMA, Appellant.

Superior Court of Pennsylvania.

Submitted April 23, 2012.

Filed May 29, 2012.

Jack W. Coopersmith, Media, for appellant.

George M. Green, Assistant District Attorney, Media, for Commonwealth, appellee.

* Former Justice specially assigned to the Superior Court.

1. Appellant did not provide this Court with any information regarding either his native country or how he arrived in the United States. However, Appellant readily admits that he is an "illegal alien," subject to deportation from the United States.

BEFORE: STEVENS, P.J., GANTMAN, J., and FITZGERALD, J.*

**OPINION BY STEVENS, P.J.**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Delaware County following Appellant Bakary Kouma's conviction by a jury on the charges of possession of a controlled substance with intent to deliver, 35 P.S. § 780–113(a)(30), possession of a controlled substance, 35 P.S. § 780–113(a)(31), and possession of drug paraphernalia, 35 P.S. § 780–113(a)(32). Appellant's sole contention is the trial court erred in ruling that, if Appellant called character witnesses to testify as to his reputation for being law-abiding, the prosecutor could cross-examine the witnesses as to their knowledge of Appellant's immigration status as an illegal alien.[1] We affirm.

The relevant facts and procedural history are as follows: On August 10, 2010, officers employed by the Upper Darby police department arrested Appellant and charged him with various offenses, including possession with the intent to distribute controlled substances. On March 10, 2011, the Commonwealth filed a "Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts under Pa.R.E. 404(b)(4)."[2] At a trial that began on March 16, 2011, several witnesses testified for the prosecution. For example, Police Officer Timothy Bernhardt, who has been a narcotics investigating officer for seven years, testified he was working in an undercover capacity on August 10, 2010, and

2. Although the certified docket entries reveal the Commonwealth filed this motion, such has not been provided for our review. Additionally, it does not appear that the trial court filed a written order addressing the motion.

conducting surveillance in a high drug area in Upper Darby Township. N.T. 3/16/11 at 20. Specifically, Officer Bernhardt sat in an undercover minivan in an area with good lighting on Golf Road. N.T. 3/16/11 at 19–22. As Officer Bernhardt conducted surveillance, at approximately 5:30 p.m., he observed a red Honda park approximately thirty feet in front of the undercover minivan. N.T. 3/16/11 at 22–26. With an unobstructed, clear view of the driver's side door of the red Honda, Officer Bernhardt observed the red Honda contained one sole occupant, the driver, who was later identified as Appellant. N.T. 3/16/11 at 26–28. Officer Bernhardt testified as follows regarding his observations of Appellant:

[PROSECUTOR]: And when you were observing the vehicle, what, if anything, did you notice?

[OFFICER BERNHARDT]: Initially, the vehicle just sat there with the operator, [Appellant], seated in the driver's side. And after a few minutes there was an individual that approached the vehicle followed by a few other individuals, and what I observed was a hand-to-hand transaction like I spoke of earlier of an individual handing something to [Appellant] and [Appellant] then handing out what I could see was a small paper object, a round object.

[PROSECUTOR]: Now, sir, I just want to be clear and make sure I understand. You indicated you witnessed an individual approach the vehicle?

[OFFICER BERNHARDT]: Yes.

[PROSECUTOR]: And you said with several other individuals behind him.

[OFFICER BERNHARDT]: They weren't stacked one after the other. It was an individual approached. A short period of time elapsed and another person approached as followed by that.

[PROSECUTOR]: And let's start with the first individual you saw approach. What area of the vehicle did this individual approach, the red Honda?

[OFFICER BERNHARDT]: The driver's side of the vehicle. I'm sorry.

[PROSECUTOR]: The red Honda we're talking about.

[OFFICER BERNHARDT]: The red Honda, correct. The red Honda. The individual approached the driver's side of the red Honda.

[PROSECUTOR]: And during your observations of the red Honda on August 10, 2010, at any point in time was there any other individual ever in the car?

[OFFICER BERNHARDT]: There was not.

[PROSECUTOR]: So [Appellant] would have been the only person you saw in the red Honda on August 10, 2010?

[OFFICER BERNHARDT]: Yes, that's correct.

[PROSECUTOR]: And you were in constant surveillance of the red Honda on August 10, 2010?

[OFFICER BERNHARDT]: That's correct. I was.

[PROSECUTOR]: Now you witnessed an individual walk up to the driver's door of this red Honda and you said you witnessed this individual engage in what you were referring to as a hand-to-hand transaction. Can you tell us exactly what it is that you saw, what movement or what body?

[OFFICER BERNHARDT]: Yes. The individual approached the driver's side of the red Honda. A hand-to-hand transaction took place where the individual approached, handed [Appellant] something and then returned. [Appellant] handed that individual what I could tell was a small round paper object and that individual then walked off.

\* \* \*

[PROSECUTOR]: How much time would you say elapsed from when the first individual approached the driver's side door, exchanged—a hand-to-hand transaction takes place, leaves and the second individual comes?

[OFFICER BERNHARDT]: A few minutes.

[PROSECUTOR]: And what, if anything, did you see the second individual do when they approached the driver's side door of the Honda?

[OFFICER BERNHARDT]: Again, the same individual with the same hand-to-hand transaction approached the driver's side of the red Honda, handed [Appellant] a — handed [Appellant] something and in return [Appellant] would in return hand the white object that I described there which would be the hand-to-hand transaction.

[PROSECUTOR]: Now you're saying same individual. Are you referring to the same individual in the Honda or the same individual coming to the window of the . . .

[OFFICER BERNHARDT]: I'm sorry. I apologize. It was a different individual that came to the red Honda. [Appellant] seated at defense table is the same individual behind the vehicle who handed another individual the white round object that I described.

\*　　\*　　\*

[PROSECUTOR]: How much time would you say elapsed going back to the first hand-to-hand transaction from when you witnessed the exchange to when that individual leaves the Honda, the red Honda?

[OFFICER BERNHARDT]: The whole period of time is five to ten minutes from the first, second, third individuals walking up to the car but the actual difference between the individuals is a minute or so.

[PROSECUTOR]: That they're at the window?

[OFFICER BERNHARDT]: Seconds. I mean it's a quick transaction. It's not a long period of time.

[PROSECUTOR]: So you didn't witness anyone standing there talking or anything like that?

[OFFICER BERNHARDT]: Correct. The transaction was several seconds long and it was basically the hand-to-hand transaction and the other individual would walk off in the area of the playground towards the track bed.

[PROSECUTOR]: And what about the second individual, the same thing?

[OFFICER BERNHARDT]: The same type thing, yes.

[PROSECUTOR]: And how about did there come a point in time when a third individual approached the driver's side of that red Honda?

[OFFICER BERNHARDT]: Yes, that's correct.

[PROSECUTOR]: And do you know how much time elapsed from when the second person had walked away until the third person approached about?

[OFFICER BERNHARDT]: A minute or so.

[PROSECUTOR]: And what, if anything, did you see between that third individual and [Appellant]?

[OFFICER BERNHARDT]: Again, it was the same hand-to-hand transaction that I described earlier. Another individual, a different individual, from the previous two had approached the driver of the red Honda Accord and a hand-to-hand transaction took place.

N.T. 3/16/11 at 28–30, 32–35.

Based on his training and knowledge, Officer Bernhardt testified that he concluded the three hand-to-hand transactions

were for drug purposes and, therefore, as the red Honda drove away, Officer Bernhardt followed it in the undercover minivan. N.T. 3/16/11 at 38, 70. Officer Bernhardt, who never lost sight of the red Honda, radioed for back-up from uniformed officers, who had been strategically stationed in the area, in order to effectuate a stop of the red Honda. N.T. 3/16/11 at 38–41. After the police stopped the red Honda, Officer Bernhardt, along with Officers Francis George and Samuel Ziviello, who were in uniform, approached the vehicle. N.T. 3/16/11 at 42. Officer Bernhardt observed in plain view on the floor behind the rear passenger seat a "white plastic bag with several blue small zip lock bags with a white powder[y] substance, which [he] immediately recognized to be cocaine." N.T. 3/16/11 at 43. The officers arrested Appellant and seized the white plastic bag. N.T. 3/16/11 at 45.

Officer Bernhardt discovered inside of the white plastic bag four brown pieces of rolled up paper, a partial Abington Bank envelope containing one yellow tablet, a partial Abington Bank envelope containing 74 tablets, a green bag containing 29 green tablets, and several blue small zip lock bags containing a white powdery substance. N.T. 3/16/11 at 45–46. The parties stipulated to the police lab report, which revealed (1) the four brown pieces of rolled up paper each contained one clear zip lock bag of cocaine, totaling 13.8 grams of cocaine, (2) the seven blue zip lock bags contained cocaine, totaling four grams of cocaine, (3) the 74 tablets were Oxycodone, totaling 34.3 grams of Oxycodone, (4) the single yellow tablet was .89 grams of Oxy-

codone, and (5) the green bag with 29 green tablets was Oxycodone, which totaled 7.8 grams of Oxycodone. N.T. 3/16/11 at 47–50.

Officer Bernhardt testified that, after police arrested Appellant, a search of his person revealed a Pennsylvania driver's license bearing the name "Kouma Bakary"[3] with an address of 18 Golf Road in Upper Darby, as well as $735.00 in U.S. currency. N.T. 3/16/11 at 62. Additionally, the red Honda was searched for inventory reasons, and Officer Bernhardt discovered a black wallet in the center console of the red Honda. N.T. 3/16/11 at 58–59. The wallet contained credit cards and insurance cards bearing the name "Bakary Kouma," which is the name Appellant provided to the police upon his arrest. N.T. 3/16/11 at 60, 68, 104. The wallet also contained a credit card bearing the name "Kouma Bakary." N.T. 3/16/11 at 105. The red Honda was registered in the name of Ishmal Sidibe.[4] N.T. 3/16/11 at 65. The Pennsylvania Department of Transportation (PennDOT) provided information that Ishmal Sidibe lived at 18 Golf Road in Upper Darby, which is the same address PennDOT had listed for Appellant. N.T. 3/16/11 at 62, 65–66.

Police Officer Samuel Ziviello, who has been a police officer for twenty-three years, confirmed he assisted Officer Bernhardt in stopping the red Honda, the sole occupant of the vehicle was Appellant, and he saw a bag of suspected drugs lying in plain view behind the rear passenger seat. N.T. 3/16/11 at 122–124. Officer Ziviello

---

**3.** Officer Bernhardt explained that it appeared Appellant secured a driver's license on which he listed his last name as his first name and vice versa.

**4.** Officer Bernhardt indicated that a JNET driver's license picture revealed that Mr. Si-

dibe and Appellant are not the same person, although they both provided the Pennsylvania Department of Transportation with the address of 18 Golf Road, Upper Darby. N.T. 3/16/11 at 65–66, 106.

indicated the bag of drugs was within Appellant's reach. N.T. 3/16/11 at 137. Officer Ziviello indicated he booked Appellant at the police station and Appellant provided him with the name of "Bakary Kouma." N.T. 3/16/11 at 128. He confirmed he seized a Pennsylvania driver's license bearing the name "Kouma Bakary" and U.S. currency from Appellant's person. N.T. 3/16/11 at 129–130.

Lisa Kelly, who works as a bail interviewer at the Delaware County Courthouse, testified she completed an interview form with Appellant on August 11, 2010. N.T. 3/16/11 at 142. In filling out the form, Appellant provided Ms. Kelly with an address of 6017 Media Suite in Philadelphia, indicated he had lived there for seven years, and informed her that he worked at the Lanser Diner in Horsham, PA. N.T. 3/16/11 at 143–144. Ms. Kelly asked Appellant, "Do you own a vehicle?" N.T. 3/16/11 at 144. Appellant responded he owned a 1999 red Honda. N.T. 3/16/11 at 145. Ms. Kelly asked Appellant "whether or not [he] used narcotics and how long [he's] been using." N.T. 3/16/11 at 145. Appellant did not respond to the question. N.T. 3/16/11 at 145.

Marisa Seifert, who is a training coordinator for Abington Bank, indicated the bank has a branch in Horsham, approximately one mile from the Lanser Diner. N.T. 3/16/11 at 156. She indicated the bank places customers' cash in envelopes, similar to those seized by the police in this case. N.T. 3/16/11 at 156–157. She noted that one of the envelopes seized by the police had the word "Kouma" written on it. N.T. 3/16/11 at 158.

Commonwealth expert witness Lieutenant Michael Boudwin, who is in charge of the Delaware County Criminal Investigation Division, Narcotics Unit, and has been a police officer for thirty-four years, testified he has been involved in over 10,000 drug investigations, including investigations involving cocaine and Oxycodone. N.T. 3/16/11 at 170–171. Lieutenant Boudwin testified drug transactions often occur in a hand-to-hand fashion. N.T. 3/16/11 at 174. With regard to Appellant's case, Lieutenant Boudwin indicated he reviewed the evidence, incident report, lab report, and bail interview sheet. N.T. 3/16/11 at 180. Lieutenant Boudwin testified blue zip lock bags are commonly used to package cocaine for sale on the street. N.T. 3/16/11 at 182. Regarding the cocaine seized in this case, Lieutenant Boudwin testified that it was "packaged for street sale." N.T. 3/16/11 at 184–185. Additionally, based on the weight of 17.8 grams, he opined the cocaine was "straight up for resale, not use." N.T. 3/16/11 at 185. Lieutenant Boudwin testified it was not common for people who are in the business of drug trafficking to "give access to just anyone [as] to their product." N.T. 3/16/11 at 185. In this regard, the relevant exchange occurred:

[PROSECUTOR]: Now as it relates to those involved in drug trafficking, sir, has it been your experience ... that those involved in the business of drug trafficking give access to just anyone to their product?

[LIEUTENANT BOUDWIN]: No.

[PROSECUTOR]: And by that I mean if hypothetically you were a drug dealer and you had 17.8 grams of cocaine, would you allow just anyone to hold onto that or be near that product, sir?

[LIEUTENANT BOUDWIN]: No. That's ready cash on the street. Again, if we just used the bench mark as $100 a gram that's $1,800 worth of product. I'm not lending my car or my house or anything to anybody and leaving $1,800 cash in the back seat and tell them you can use my car. If you lose it, don't worry about it. It's a very secretive

business. It's a very close to the heart business. You don't step outside and involve people that are not involved. N.T. 3/16/11 at 185–186.

Lieutenant Boudwin valued the Oxycodone seized in this case at approximately $1,500 and the cocaine at approximately $1500 to $1,800. N.T. 3/16/11 at 187–189. He indicated the drugs were similar to "ready cash on the street." N.T. 3/16/11 at 189. *Lieutenant Boudwin testified that, in his experience, it is quite common for individuals, who are involved in drug trafficking, to use cars that are registered in someone else's name.* N.T. 3/16/11 at 195. He testified it was also common for drug traffickers to have more than one address since they attempt to separate the drug trafficking from their residence. N.T. 3/16/11 at 195. Lieutenant Boudwin specifically opined that Appellant possessed the cocaine and Oxycodone with the intent to deliver it. N.T. 3/16/11 at 201. He indicated Officer Bernhardt's observation of three hand-to-hand transactions, as well as Appellant's possession of $735 in currency, bolstered his opinion that the narcotics were possessed with the intent to distribute, as opposed to for personal use. N.T. 3/16/11 at 202, 205.

The defense presented a single witness, namely Kathleen Sullivan, who testified that, at 5:00 p.m. on August 10, 2010, Appellant, who was driving a red Honda, picked her up at her place of employment in Ardmore, and they drove to his house at 18 Golf Road, where Ms. Sullivan visited with Appellant's daughter. N.T. 3/16/11 at 212–216. They stayed at the house until 5:35 p.m., at which time Appellant drove her to a halfway house, where he dropped her off at approximately 5:45 p.m. N.T. 3/16/11 at 216–17. Ms. Sullivan indicated Appellant usually drives a silver Mitsubi-

shi; however, he was driving the red Honda on that day because his Mitsubishi required service. N.T. 3/16/11 at 215. Ms. Sullivan admitted that, on November 14, 2008, she pleaded guilty to ten counts of forgery, ten counts of access device unauthorized use, and ten counts of theft by unlawful taking. N.T. 3/16/11 at 218–219.

At the conclusion of Ms. Sullivan's testimony, as the jury retired for the day, the following relevant exchange occurred:

[DEFENSE COUNSEL]: Your Honor, before I call my next witness, I need to take up a legal matter with you.

\* \* \*

THE COURT: All right. Defense counsel.

[DEFENSE COUNSEL]: Your Honor, I didn't think that we would be getting to the issue this quickly or I would have had copies of these cases, but I do have two cases that I'd like to call to the Court's attention, *Commonwealth v. Malina* [*Molina*], 897 A.2d 1190 [ (Pa.Super.2006) ], and *Commonwealth v. Sanchez* [407 Pa.Super. 234], 595 A.2d 617 [ (Pa.Super.1991) ], that speak to the issue of a jury finding out about a defendant's illegal immigration status. And although neither opinion resulted in a reversal for other reasons, I interpret both opinions to be saying it's something the jury should not be finding out about, and it is overly prejudicial. I'm not trying to negotiate with the Court, but I can tell you that I do not plan to call any character witnesses based on Your Honor's ruling that if I call a character witness [Appellant's] immigration status would be fair game.[5] However, [Appellant] cannot defend himself in this case without testifying and I think that. . . .

---

**5.** Appellant has failed to point to that portion of the record where this apparent prior ruling occurred. In any event, as discussed *infra,* it is clear that the trial court so ruled.

THE COURT: I understand that.

[DEFENSE COUNSEL]: And I think if he testifies and the jury finds out about his immigration status it would be extremely prejudicial, I would submit, under Rule 403[,] overly prejudicial development in the case. His immigration status is not in and of itself an illegal act.

THE COURT: What, it isn't?

[DEFENSE COUNSEL]: No, it isn't.

THE COURT: How can you say that?

[DEFENSE COUNSEL]: Because he's not violating any federal criminal law by being there. The immigration crimes that attend the legal immigration status sometimes have to do with forging documents to get here.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: Or coming back here after you've been kicked out. But at this moment he is not violating federal criminal law by being here. I see you're skeptical about that.

THE COURT: Well, I'm trying to remember actually.

[DEFENSE COUNSEL]: Okay.

THE COURT: And what I'm trying to remember is the Supreme Court's analysis in *Plyler v. Dell,* [ph] where they reviewed all the immigration statuses with regard to what the status of illegal immigrants is.

[DEFENSE COUNSEL]: I'm not saying he's not . . . .

THE COURT: And what remedies the United States government has to deal with them. I don't recall that it was criminal in nature.

[DEFENSE COUNSEL]: I'm not suggesting that he's not subject to deportation. In fact, he is.

THE COURT: Right. I understand that.

[DEFENSE COUNSEL]: But he's not violating federal criminal law by being here.

THE COURT: Well, criminal law.

[DEFENSE COUNSEL]: Or even state criminal law. No criminal law by being here. Right now he's not violating any criminal law . . .

[PROSECUTOR]: But there is a law. It's the immigration law.

[DEFENSE COUNSEL]: It's not criminal law.

[PROSECUTOR]: It doesn't have to be criminal for him to be law-abiding. Law-abiding means you follow any and all laws.

THE COURT: Well, we're not going to get to that.

[DEFENSE COUNSEL]: We're past that. I'm past that. I'm not calling character.

N.T. 3/16/11 at 229–234 (footnote added).

Prior to the jury entering the courtroom on the next day, the following relevant exchange occurred:

THE COURT: [Defense counsel], I read your cases with regard to this issue of being an illegal alien, and they are interesting cases. Both of them . . . .

[DEFENSE COUNSEL]: Pardon me, Your Honor?

THE COURT: They're interesting cases. Both of them were decided on the issue that whether this was a taint or not, the evidence was overwhelming, therefore, if it were an error it would be a harmless error.

\* \* \*

[PROSECUTOR]: Your Honor, I have explained to counsel after reviewing the case, I don't want to create an issue in my case. As I stand here, I'm of the opinion there are no issues now and I

don't want to create any [as to Appellant testifying].

\* \* \*

I have indicated to [defense] counsel that I have not changed my position as it relates to character witnesses because I don't think [Appellant's] character for law-abidingness is simply limited to criminal law. I think it's fair that it's any and all laws of the jurisdiction.

THE COURT: I agree.

[PROSECUTOR]: And certainly him being in the country illegally is against the laws of this jurisdiction.

THE COURT: All right. I agree with that.

[DEFENSE COUNSEL]: But the criminal laws. He's not violating criminal laws by being here.

THE COURT: I don't know that. It's certainly violating the law. There's no doubt about that.

[DEFENSE COUNSEL]: But not criminal law or else someone would come and arrest him.

THE COURT: I don't know whether it's criminal or not.

[DEFENSE COUNSEL]: So when [the prosecutor] comes back, I perhaps can inquire as to where we are.

\* \* \*

Your Honor, just so I'm clear, the district attorney is saying that she's not inclined to ask [Appellant] about his immigration status [if he testifies].

THE COURT: All right.

\* \* \*

[PROSECUTOR]: I would intend to ask any character witnesses [if they testify].

[DEFENSE COUNSEL]: So, Your Honor, as it turns out, and I apologize if I caused you to burn the midnight oil needlessly, but as it turns out just as the district attorney has revisited her position on the issue and [Appellant] and I have revisited our position on the issue, and I can tell you that in terms of his testifying and whether he would be asked about that or not, the issue is academic because he's electing not to testify. However, I would have called character witnesses [if] not for Your Honor's ruling on the issue. That I haven't changed my position on.

THE COURT: All right.

[DEFENSE COUNSEL]: So it's academic as to his testimony but in my view it's still an issue as to character witnesses, so I intend to rest.

THE COURT: All right.

N.T. 3/17/11 at 1–10.

Thus, as result of the trial court's ruling, Appellant did not present character witnesses. The jury convicted Appellant of the offenses indicated *supra,* and on July 6, 2011, the trial court sentenced Appellant to an aggregate of eight years to sixteen years in prison. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

Appellant's sole contention is the trial court erred in ruling that, if Appellant called character witnesses to testify as to his reputation for being law-abiding, the prosecutor could cross-examine the witnesses as to their knowledge of Appellant's immigration status as an illegal alien.

 It is well-settled that "[t]he scope of cross examination is a matter within the trial court's discretion and will not be disturbed by this Court absent an abuse of that discretion." *Commonwealth v. Hoover,* 16 A.3d 1148, 1149 (Pa.Super.2011). "As a general matter, Pennsylvania Rule of Evidence 404(a) pronounces a broad prohibition on using evidence of an accused's bad character to establish 'action

in conformity therewith' during a criminal proceeding." *Commonwealth v. Fletcher,* 580 Pa. 403, 432, 861 A.2d 898, 915 (2004). Nonetheless, pursuant to Pa.R.E. 404(a)(1), "the accused may offer witnesses to testify to the accused's relevant character traits." *Hoover,* 16 A.3d at 1149 (citation omitted). *See* Pa.R.E. 404(a)(1) ("In a criminal case, evidence of a pertinent trait of character of the accused is admissible when offered by the accused, or by the prosecution to rebut the same."). "In order to prove this [relevant] trait of good character, the accused may opt to introduce evidence of his or her reputation among associates or within a particular community." *Fletcher,* 580 Pa. at 432, 861 A.2d at 915 (*citing* Pa.R.E. 405(a)). However, if the accused offers such reputation evidence, the Commonwealth may attempt to impeach those witnesses. *See Fletcher, supra; Commonwealth v. Ross,* 856 A.2d 93, 101 (Pa.Super.2004) ("A defendant who presents character testimony runs certain risks [since] character witnesses, like other witnesses, can be subjected to cross-examination."). "For example, when cross examining character witnesses offered by the accused, the Commonwealth may test the witnesses' knowledge about specific instances of conduct of the accused where those instances are probative of the traits in question." *Hoover,* 16 A.3d at 1149–50 (*citing* Pa.R.E. 405(a)). *Fletcher,* 580 Pa. at 432, 861 A.2d at 915 (holding the Commonwealth, on cross-examination, may question the accused's character witnesses regarding their knowledge of particular acts of misconduct by the accused to test the accuracy of the witnesses' reputation evidence).

This Court has consistently repeated the principle that although evidence of good character may not be rebutted by evidence of specific acts of misconduct, a character witness may be cross-examined regarding his or her knowledge of particular acts of misconduct by the defendant to test the accuracy of his or her testimony and the standard by which he or she measures reputation.

*Fletcher,* 580 Pa. at 433, 861 A.2d at 915–16 (quotation marks, quotation, and citation omitted).

Therefore, if, in the case *sub judice,* Appellant presented reputation evidence as to his character for being law-abiding, Appellant would "open the door" for the Commonwealth to cross-examine his character witness regarding specific instances of conduct, which are probative of the law-abiding trait in question. *Fletcher, supra; Hoover, supra;* Pa.R.E. 405(a). Thus, we must determine whether Appellant's immigration status as an illegal alien, subject to deportation, is probative as it relates to his trait of being law-abiding.

■ By its very definition, the term "law-abiding" means "abiding by or obedient to the law." *Merriam Webster's Collegiate Dictionary* at 659 (10th ed.1997). This Court has recognized that references to a defendant as an illegal alien is the type of evidence upon which a jury may reasonably infer the defendant has engaged in past illegal conduct, *i.e.,* that the defendant was not law-abiding. *See Commonwealth v. Molina,* 897 A.2d 1190 (Pa.Super.2006); *Commonwealth v. Moore,* 715 A.2d 448 (Pa.Super.1998); *Commonwealth v. Sanchez,* 407 Pa.Super. 234, 595 A.2d 617 (1991). In fact, by its very nature, an illegal alien is someone who is present in the United States in violation of this Country's immigration laws. *See* 8 U.S.C.A. § 1227 (indicating a deportable alien includes "[a]ny alien who is present in the United States in violation of the [Immigration and Nationality Act, 8 U.S.C.A. § 1101 *et seq.,*] or any other law of the United States, or whose immigration visa (or other documentation authorizing

admission into the United States as a nonimmigrant) has been revoked ... is deportable."). Thus, under Pa.R.E. 404 and 405, the Commonwealth is permitted to use a defendant's immigration status as an illegal alien to call into question the character witnesses' qualifications to speak for the community on the issue, i.e., their basis of knowledge of the person or law-abiding trait and the standard by which they measure reputation. *Street Road Bar & Grille, Inc. v. Pennsylvania Liquor Control Bd.*, 583 Pa. 72, 93, 876 A.2d 346, 358 (2005); Pa.R.E. 405(a).

However, this does not end our inquiry as Appellant further contends the evidence of his immigration status should be excluded since its probative value is outweighed by the potential prejudice.

■ When evidence meets the requirements of the Rules discussed *supra*, such evidence may still be excluded where "its probative value is outweighed by the danger of unfair prejudice[.]" Pa.R.E. 403. *See Stumpf v. Nye*, 950 A.2d 1032 (Pa.Super.2008). The Comment to Pa.R.E. 403 instructs that: "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt (quotation marks omitted).

> However, [e]vidence will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case.... This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]

*Commonwealth v. Page*, 965 A.2d 1212, 1221 (Pa.Super.2009) (quotations and quotation marks omitted).

■ Here, we conclude that, if Appellant "opened the door" by presenting character witnesses to testify regarding Appellant's reputation for being a law-abiding citizen, it would not be unduly prejudicial to permit the Commonwealth to test the witnesses' knowledge by asking them about Appellant's undisputed illegal immigration status. Simply put, under such circumstances, evidence of Appellant's status as an illegal alien would not "rouse a jury to overmastering hostility." *Page*, 965 A.2d at 1221 (quotation marks omitted). *See Molina, supra* (finding trial counsel was not ineffective in failing to object to the prosecutor's questioning of the victim and the appellant regarding the appellant's illegal immigration status since such evidence was part of a chain or sequence of events and not unduly prejudicial).

Therefore, for the reasons discussed *supra*, we hold that, when a defendant's character witnesses make the blanket assertion that the defendant has the reputation of being law-abiding, the Commonwealth may cross-examine the character witnesses as to their knowledge that the defendant is present in this country in violation of the immigration laws, or any other law, of the United States. Such cross-examination is permissible under Pa. R.E. 403, 404(a)(1), and 405(a).

■ In any event, assuming, *arguendo*, the trial court's ruling was in error, we conclude any such error was harmless in this case.

> An error is harmless where the uncontradicted evidence of guilt is so overwhelming that, by comparison, the error is insignificant. When discussing harmless error, we have also stated that the Commonwealth can meet its burden of

showing harmlessness by persuading us the error did not prejudice the appellant or did so to a *de minimis* extent and/or by persuading us the properly admitted and uncontradicted evidence was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Hoover,* 16 A.3d at 1150 (citations omitted).

 While we recognize that character testimony is substantive evidence and may create a reasonable doubt of guilt, *see Commonwealth v. Harris,* 785 A.2d 998 (Pa.Super.2001), in this case, the evidence of Appellant's guilt is so overwhelming that the trial court's ruling, which resulted in Appellant's decision to not call character witnesses to testify regarding Appellant's reputation for law-abidingness, is, at most, harmless error. For instance, Officer Bernhardt testified that, based on his training and experience, he observed Appellant, who was sitting in a red Honda, conduct three hand-to-hand drug transactions on Golf Street. Without losing sight of the red Honda, Officer Bernhardt followed the vehicle until two uniformed officers arrived to provide assistance in stopping the vehicle. Upon approaching the red Honda, Officer Bernhardt, whose testimony was confirmed by Officer Ziviello, observed in plain view a bag of narcotics, which was in Appellant's reach. In addition to the narcotics, the bag contained partial Abington Bank envelopes. Appellant's last name was written on one of the envelopes. Officers Bernhardt and Ziviello testified Appellant, who told police his name is "Bakary Kouma," had in his possession a Pennsylvania driver's license and a credit card bearing the name "Kouma Bakary," as well as credit cards and an insurance card bearing the name "Bakary Kouma." The address on Appellant's driver's license was listed as 18 Golf Road.

Lieutenant Boudwin, whose testimony was uncontradicted, testified that Appellant possessed the drugs with the intent to deliver them. Additionally, as noted by the Commonwealth on appeal, although Appellant presented the testimony of Ms. Sullivan in order to attempt to establish an alibi, her testimony actually placed Appellant in the red Honda in the area of the drug transactions at the time in question. Thus, in light of the overwhelming evidence of Appellant's guilt, the trial court's ruling was, at most, harmless error.

For all of the foregoing reasons, we affirm.

Affirmed.