J-A14024-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TASAI  BETTS | |
| Appellant | No. 1275 MDA 2015 |

Appeal from the Judgment of Sentence May 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0001004-2014
CP-22-CR-0003339-2013

BEFORE:  BOWES, J., OTT, J., and PLATT, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 30, 2016**

Tasai Betts appeals from the judgment of sentence imposed on May 14, 2015, in the Court of Common Pleas of Dauphin County, made final by the denial of post-sentence motions on June 23, 2015.  On October 29, 2014, at Docket No. CP-22-CR-0001004-2014 ("Docket No. 1004-2014"), a jury convicted Betts of attempted criminal homicide,[1] robbery,[2] and related offenses for a shooting incident that occurred on June 13, 2013.  On March 2, 2015, in a separate, but related, matter at Docket No. CP-22-CR-

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  18 Pa.C.S. § 901(a).

[2]  18 Pa.C.S. § 3701(a)(1)(i).

0003339-2013 ("Docket No. 3339-2013"), a jury convicted Betts of aggravated assault[3] and other offenses for an accident involving a police chase on June 22, 2013. With respect to both dockets, the court sentenced Betts to an aggregate term of 21-42 years' imprisonment, plus 15 years of probation. On appeal, Betts raises evidentiary and discretionary aspects of sentencing claims. For the reasons below, we affirm Betts's judgment of sentence.

The trial court set forth the factual history in its June 23, 2015, memorandum, which disposed of Betts's post-sentence motions:

> At trial, the victim, Sgt. Kenneth Durbin testified that he fell asleep in his car outside a friend's home around 7:30 P.M. A friend had driven his car home after work and after stopping at a bar for about two beers. Sgt. Durbin was not comfortable driving as he was tired and had some drinks so he let his friend drive. He intended to take a short nap before driving on, but instead fell asleep for several hours. Ibraheem Muhammad, Sgt. Durbin's friend testified that Sgt. Durbin had driven him home a couple times before, but that he was not aware of any other times that Sgt. Durbin would have been in the neighborhood.
>
> The next thing Sgt. Durbin recalled was being woken up around 1 A.M. when an individual wearing a hood over his face was standing over him demanding his money. The man was accompanied by about 3 others who were standing near the car and who did not make contact with the car. Sgt. Durbin admitted that while he was asleep he did not know who had been through the neighborhood or milling around his car at all.
>
> Sgt. Durbin turned away when he felt a hand grasping his shirt. At that point he realized it was [] not a friend and he cursed at his assailant and tried to get him off. Immediately, he

_____

[3] 18 Pa.C.S. § 2702(a)(2).

- 2 -

heard a pop, saw a flash and felt a bullet go into his abdomen. He saw part of the gun at the time of the incident, but could not identify a particular gun at trial.

He was shot 3 times at close range. He then made a large push at his shooter and kicked him back, but did not knock him over. Sgt. Durbin dove into his car and was shot twice on the way in. He turned the car on and reversed it and then drove forward trying to escape. Sgt. Durbin testified that the three people with the shooter scattered without touching the car when he reversed. The shooter's face remained covered by the hood and Sgt. Durbin admitted that he could not recognize with certainty the person who shot him that night.

Sgt. Durbin started jamming on his horn, hoping that someone might hear it and help him. No one came to his aid. Kathy Fearnbaugh, a neighbor, testified that she heard gun shots, but did not look out the window for a couple of minutes. She then heard someone laying on the horn so she called 9-1-1. She recalled hearing people running and saying something like "let's get out of here." She did not see any gunshots or see anyone running.

Sgt. Durbin started to drive to a nearby gas station for help. He got out of his car, said he'd been shot and people start[ed] screaming and calling 9-1-1. An ambulance arrived and the medics started to administer first aid. Sgt. Durbin was transported to the hospital where he had several surgeries over the course of the next several months. Several bullet fragments remain in his lungs and torso.

He was able to give a description of his attacker to Detective Krokos when he visited Sgt. Durbin at home sometime after he was released. That description was "the individual was about my height, slender build, 16-20. His build reminded me of Steve Urkel." He was shown a photo array and while he did not initially identify someone on it, he ultimately did identify [Betts], admitting he was not 100% sure of the accuracy.

[Betts] was unknown to Sgt. Durbin at the time of the attack and had never been in his car, nor touched the outside of his car.

Officer Brian Henry of the Harrisburg Police Department was on duty that night. He received a call about the shooting. Officer Henry first proceeded to 19th and State Streets where the shooting occurred but was redirected to the gas station at 16th and State Streets where the victim presented himself.

Officer Henry observed Sgt. Durbin laying [in] the fetal position next to his car with gunshot wounds all over his body. Sgt. Durbin was unable to provide much information as he seemed to be in a state of shock. Officer Henry's primary responsibility was to stay with the officer processing the scene that night. At no point did anyone breach the police tape around Sgt. Durbin's car nor come into contact with his car. However, Officer Henry was unsure of how many civilians were present that night. The vehicle was then towed to the police lot.

Officer Christopher Thomas, also of the Harrisburg Police Department, was on duty as well. He also heard the call about the shooting and went to the gas station where he found the victim bleeding, with a weak pulse and having difficulty breathing. He never saw any civilians touch the vehicle while he was there helping stabilize the victim. Officer Thomas then began to look for the crime scene. He received word of a phone call indicating that the shooting happened near the 1700 block of Miller Street.

Officer Thomas located a watch that Sgt. Durbin said he lost as well as several bullet casings in the 1700 block of Miller Street. Officer Duane Pyles processed the scene.

Officer Pyles is also a member of the Harrisburg Police Department. He was on duty on the night of the shooting and took the forensics call. He arrived at the scene and began processing and putting up the crime scene tape. He never saw anyone come into contact with the vehicle while he was at the scene. Officer Pyles called for a tow truck to tow the vehicle to the station and then the secure lot.

He also processed the crime scene in the 1700 block of Miller Street. The casings he found there appeared to be the same as the casing he found at the gas station scene, though this was based solely upon a visual inspection and not upon any scientific testing. From his experience, this type of bullet was from a .22 caliber.

- 4 -

Investigator Karen Lyda, of the Harrisburg Police Department, is a forensic investigator. She was qualified as an expert in her field for testimony. She processed the vehicle and took fingerprints in this particular case, however she did not go to the scene. Investigator Lyda found two .22 caliber Remington casings – one in the rear driver's door area and one on the seat on the rear driver's side.

She found latent prints in and on the car. Sgt. Durbin's prints were discovered on the inside of the driver's window. Further, a partial palm print was found on the outside of the car; it was identified as [Betts's] palm print. She also processed a gun and magazine. She was unable to find a latent print on the gun, but testified that as guns are made of metal, this is not unusual. Investigator Lyda indicated that there is no way to tell when a print was made.

Officer Eric Moyer of the Swatara Township Police Department testified about an auto accident on June 22, 2013.[4] [Betts] was an occupant of the vehicle that crashed and inside the vehicle there was a .22 caliber handgun. Officer Moyer secured the gun, which had one round in its chamber and several rounds in the magazine, and turned it over to Highspire Police.

Officer Ronald Weber of the Highspire Police Department also testified as to the June 22 events. He was called into duty to respond to the car accident. He received the gun from Swatara Police. He removed the bullets from the magazine and saw that there were four bullets, therefore there was a total of five bullets with the gun, the four in the magazine and the one in the chamber that Officer Moyer had cleared. He also noted that the gun's serial number had been obliterated to try to prevent identification. The weapon was taken to the lab for further testing.

Ultimately, the Harrisburg Police Department contacted Officer Weber expressing an interest in the gun. The gun was

_____

[4] This incident is at Docket No. 3339-2013. Police officers attempted to pull over the car when Betts fled away and crashed the car.

turned over to the Pennsylvania State Police lab by both departments so that both got the testing results.

Robert Parker Jr., of Harrisburg, testified that he knew [Betts] and that he was familiar with handguns. He recalled seeing the gun in [Betts's] possession in May of 2013.

Janel Williams, of Harrisburg, testified that she was in the vehicle at the time of the accident and that [Betts] was driving. She recalled seeing the gun in his possession and hearing him refer to it as his gun.

Corporal David Krumbine of the Pennsylvania State Police is a firearm and tool mark examiner. His duties involve examining firearms and determin[ing] their make, model, caliber, serial number, functionality and examining discharged components and comparing them to questioned firearms. He was qualified as an expert in firearm and tool mark examining. He examined the gun from the car accident as well as the bullets. He also examined the shell casings from the shooting. He compared the discharged cartridges to the gun. He did several test fires of the gun. Based upon his examination, he determined that the bullets found on Miller Street and in Sgt. Durbin's car were fired from the gun found following the car accident. There were three other discharged bullets that he could not identify as having come from that gun as they were too mutilate[ed]. Based upon the labels of the evidence bags, those bullets came from Sgt. Durbin's body. Those bullets also appeared to be the same type of bullet as was found in the gun and the car.

Detective Christopher Krokos is assigned to the Criminal Investigation Division of the Harrisburg Police. The case involving Sgt. Durbin's shooting was assigned to him. About a week and a half after the shooting, Det. Krokos went to[] Sgt. Durbin's home to talk to him about the incident. Sgt. Durbin's statement was consistent with his in-court testimony. He also had Sgt. Durbin view a photo array. Sgt. Durbin indicated that the photo of [Betts] closely resembled the person who shot him, but that he was not one hundred percent certain because of the hood. As Sgt. Durbin was not one hundred percent sure of the identification, Det. Krokos continued his investigation.

At that point, Det. Krokos became aware of the car accident that [Betts] was in several days after the shooting. He, along with Investigator Lyda, decided to contact Highspire Police and ask them to send the gun to PSP so they could share results. The results took quite some time to get back and then, on October 10, 2013, Det. Krokos spoke with [Betts].

Det. Krokos explained that the gun ballistics matched the bullets from Sgt. Durbin. [Betts's] palm print was on Sgt. Durbin's car and [Betts] was found in the car with the gun. [Betts] told Det. Krokos that he did not know Sgt. Durbin, but that the gun was his. Then he said the gun was given to him by someone. Per the docket, [Betts's] birth day is March 7, 1996, so he would be roughly 17 at the time of the shooting. In Pennsylvania, one must be 21 years old to get a license to carry a firearm.

Trial Court Opinion, 6/23/2015, at 3-9 (record citations omitted).

With respect to Docket No. 1004-2014, an initial two-day jury trial began on October 21, 2014. However, a mistrial occurred on October 22, 2014. The trial court expounded on the subsequent procedural history as follows:

At that time, Robert Parker Jr. testified about having seen [Betts] with the gun that he was alleged to have used in shooting Sgt. Durbin prior to the day of the shooting. On cross-examination Mr. Parker testified that he had seen the gun as it was pointed at his head. The Court tried to direct him away from using that language by asking if [Betts] had shown him the gun, but he corrected the court to indicate that it was pointed at his head. At sidebar defense counsel moved for a mistrial based upon this testimony and explained that it was related to a pending robbery charge. Ultimately, after reviewing what he was permitted to say with the witness, that mistrial was granted.

Subsequently, a trial was held on October 28-29. Again, Mr. Parker testified that he saw [Betts] in possession of the gun. Upon cross-examination, he indicated that he did not recall what he told police as the gun was pointed at his head. Again, trial was stopped, the jury was sent out and [defense counsel]

motioned for a mistrial based on evidence of prior bad acts being admitted in contravention of Pa.R.E. 404(b). The Commonwealth argued that the testimony was permitted for identification purposes. Ultimately, the Court determined that the mistrial would be denied but that the jury would be instructed about the limits for which they could utilize Mr. Parker's testimony – that is, it could [] be used for identification purposes. At the time of the charge [the trial c]ourt did use a limiting instruction as follows:

"You heard testimony from Mr. Parker, who testified earlier this morning. His testimony should only be considered by you for the limited purposes of identification of either Mr. Betts or the firearm. And you'll use the same criteria I gave you as to testimony and credibility."

Trial Court Opinion, 8/31/2015, at 2-3 (record citations omitted).

The jury convicted Betts of attempted homicide, robbery, aggravated assault, carrying a firearm without a license, and possession of a firearm by a minor.[5] The court originally sentenced Betts on January 5, 2015. However, he filed a post-sentence motion, arguing his sentence should be modified because the aggravated assault charge merged with the attempted homicide charge for sentencing purposes, and he asked for an arrest of judgment. On February 26, 2015, the court granted the motion as to the modification of sentence but denied the arrest of judgment request. On May 14, 2015, the court imposed the following sentence: (1) ten to 20 years' incarceration for the attempted homicide conviction; (2) a consecutive term of five to ten years' imprisonment for the robbery offense; (3) a consecutive

_____

[5] 18 Pa.C.S. §§ 901(a), 3701(a)(1)(i), 2702(a)(2), 6106(a)(1), and 6110.1(a), respectively.

term of two to four years' incarceration for the carrying a firearm without a license violation; and (4) a consecutive term of five years' probation for the possession of a firearm by a minor violation.[6]   Betts filed another post-sentence motion, which was denied on June 23, 2015.

With regard to Docket No. 3339-2013, on March 2, 2015, a jury convicted Betts of aggravated assault, four counts of reckless endangerment of another person ("REAP"), possession of a firearm with manufacturer number altered, possession of a firearm by a minor, carrying a firearm without a license, fleeing and eluding, possession of a controlled substance, possession of drug paraphernalia, and several summary offenses.[7]   On May 14, 2015, the court sentenced Betts as follows:  (1) four to eight years' incarceration for the aggravated assault conviction; (2) a consecutive term of four years' probation for all four counts of REAP; (3) a consecutive term of two years' probation for the firearm with an altered number violation; (4) a consecutive term of two years' probation for the possession of firearm by a minor violation; and (5) a consecutive term of two years' probation for the carrying a firearm without a license violation.  Betts filed post-sentence motions, which were denied on June 23, 2015.

---

[6]   All counts were to run consecutively to the sentences imposed at Docket No. 3339-2013.

[7]   18 Pa.C.S. §§ 2702(a)(2), 2705, 6110.2(a), 6110.1(a), 6106(a)(1), 75 Pa.C.S. § 3733(a), 35 P.S. §§ 780-113(a)(16) and (a)(32), respectively. The jury found him not guilty of attempted criminal homicide.

On July 23, 2015, Betts filed a notice of appeal with respect to both dockets. Four days later, the trial court ordered Betts to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Betts filed a concise statement on August 18, 2015. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 31, 2015.

In his first issue, Betts contends the trial court abused its discretion by refusing to grant a mistrial at his second trial after one of the witnesses, Parker, divulged certain prior bad act evidence that was previously determined to be inadmissible at Betts's first trial and resulted in a mistrial. Specifically, Betts notes Parker was limited to stating that he saw Betts in possession of the gun two weeks prior to the shooting at issue and "[d]espite clear admonitions to Robert Parker regarding his conduct during cross-examination, he twice violated the [trial court]'s exclusionary order." Betts's Brief at 45. Betts points out Parker violated the exclusionary rule at the first trial when Parker testified that Betts pointed the gun at him and a mistrial resulted due to the prejudicial effect of the testimony. He states: "Under almost identical circumstances at the second trial, the trial court failed to find such prejudice." *Id.* Betts asserts the court's rationale for denying a second mistrial cannot withstand scrutiny because: (1) even if the testimony was minimal, the "whole purpose of moving *in limine* to exclude inadmissible evidence is to prevent any reference to such evidence;" (2) the curative instruction was insufficient; and (3) "[d]efense counsel was

- 10 -

not at fault in eliciting Robert Parker's non-responsive answer." *Id.* at 47-48 (emphasis removed).

Initially, we note that to the extent Betts argues there was a violation of the trial court's ruling on the pre-trial motion *in limine* at the first trial, we find he appears to have waived this claim because he did not raise it in his concise statement and the trial court did not address it in its opinion.[8] "[T]he grant of a new trial 'wipes the slate clean,' *see **Commonwealth v. Mulholland**,* 549 Pa. 634, 652, 702 A.2d 1027, 1035–36 (1997), so that a previous court's ruling on the admissibility of evidence generally does not bind a new court upon retrial, *see **Commonwealth v. Hart**,* 479 Pa. 84, 86, 387 A.2d 845, 847 (1978)[.]" ***Commonwealth v. Paddy***, 800 A.2d 294, 311 (Pa. 2002). Therefore, even if preserved on appeal, Betts's argument would have no merit as he did not properly preserve the issue in a subsequent motion *in limine*.

Turning to the remainder of his argument, we are guided by the following:

> With regard to the admission of evidence, we give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of

---

[8] ***See*** Concise Statement, 8/18/2015 ("This Honorable Court erred in denying Appellant's motion for a mistrial where prior bad acts evidence was improperly admitted in contravention of Pa.R.E. 404(b)").

judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of the record.

***Commonwealth v. Flamer****,* 53 A.3d 82, 86 (Pa. Super. 2012) (citations and quotation marks omitted).

"Relevance is the threshold for admissibility of evidence." ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015); ***see also*** Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; ***see also Tyson***, 119 A.3d at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.").

"The court may exclude relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice[.]" Pa.R.E. 403; ***see also Commonwealth v. Kouma***, 53 A.3d 760, 770 (Pa. Super. 2012) (stating that even when evidence meets the relevance requirements, "such evidence may still be excluded where its probative value is outweighed by the danger of unfair prejudice.").

> However, [e]vidence will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case[.] This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]

***Kouma****,* 53 A.3d at 770 (citation omitted); ***see also*** Pa.R.E. 403 cmt. (defining "unfair prejudice" as "a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.").

***Commonwealth v. Talbert***, 129 A.3d 536, 539 (Pa. Super. 2015) (citation

omitted).

Pennsylvania Rule of Evidence 404 provides, in relevant part:

**(b) Other crimes, wrongs, or acts.**

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404 (b)(1)-(3).

Here, the trial court provided the following reasoning for admitting Parker's testimony and denying Betts's request for a mistrial:

> The prosecution initially filed a motion *in limine* to permit evidence of prior bad acts related to both the robbery of Mr. Parker and a car chase that occurred after the shooting to prove identity. Indeed, evidence of prior bad acts is admissible to help prove the identity of the perpetrator of a crime; however, the probative value must outweigh any prejudicial effect. ***Commonwealth v. Lockcuff***, 2002 PA Super 388, ¶ 12, 813 A.2d 857, 861 (2002). Further, prior cases have permitted testimony that a defendant charged in one case was in possession of a gun at another time is permissible as it tends to show the identity of the person who used the gun. ***Commonwealth v. Reid***, 533 Pa. 508, 512, 626 A.2d 118, 120 (1993); ***see also***, ***Commonwealth v. Jones***, 457 Pa. 563, 575, 319 A.2d 142, 149 (1974).

> "While the potential for prejudice, meanwhile, can be great when "other crimes" evidence is calculated to inflame the jury's emotions of sympathy or hostility, the potential is mitigated where, as here, the focal point of the evidence is the precise

criminal method used." ***Commonwealth v. Weakley***, 2009 PA
Super 74, ¶ 25, 972 A.2d 1182, 1191 (2009)[.]

Mr. Parker was called to testify as to the fact that he had
seen [Betts] with the same gun on a prior date in order to help
prove [Betts's] identity as the shooter in the later crime. His
testimony did include a reference to the gun being pointed at
him which could raise issues of prejudice; however, this Court
ended his testimony fairly quickly and instructed the jury during
the closing charge to use his testimony solely for the purpose of
identification. In our case, the focal point of the evidence was
merely that [Betts] possessed the gun on a date prior to the
date of this shooting.

Further, the prosecution merely questioned Mr. Parker as
to whether he had seen [Betts] in possession of the handgun
prior to the date of the shooting. Mr. Parker replied
affirmatively. However, on cross-examination, defense counsel
began to question Mr. Parker regarding his speaking to police
and giving them a statement. It was at this point that Mr.
Parker became confused and inadvertently indicated the gun had
been pointed at him. Based on our limiting instruction and the
fact that we ended Mr. Parker's testimony at this point, the
probative value of identity outweighed any possible prejudicial
effect of this testimony and the evidence of a prior bad act was
properly admitted.

Trial Court Opinion, 8/31/2015, at 3-4.

We agree with the court's rationale. A review of the record reveals the

following. On direct examination by the Commonwealth, Parker did not

make a statement that the gun was ever pointed at him. ***See*** N.T.,

10/28/2014-10/29/2014, at 211 ("Q. And did you see that weapon in the

possession of Tasai Betts on May 29th, 2013? A. I did so, sir."). However,

on cross-examination, the following exchange took place:

[Defense counsel:] Yes or no: You did speak with police about
seeing the gun, correct?

- 14 -

[Parker:]  Yes.

…

[Defense counsel:]  Do you remember telling them that you believed it was a 9 mm handgun?

[Parker:]  I thought it, yes.  With a gun pointed at me, I didn't know what it was.  Yes.

[Defense counsel:]  Okay.  But --

[Parker:]  I'm sorry.

[Defense counsel:]  So you saw a close-up of the weapon, correct?

[Defense counsel]: Judge, may we approach?

*Id.* at 212-214.  A sidebar discussion then took place between the parties and the trial court regarding defense counsel's request for a mistrial.  The court denied the mistrial, stating:

> I'm not going to allow the circumstances to come in. We're not going to go any further in the testimony.  He identified the gun.  You crossed him and brought out the fact that the gun may not be the possible gun.  I believe he's completely traumatized, and we're going to continue to go forward.
>
> So the information as to the identification of the gun from the robbery in May of 2013 comes in for the limited purpose of the identification of the weapon.

*Id.* at 216-217.  Defense counsel then asked for a revised limited instruction on the issue during closing arguments, which the trial court granted.  *Id.* at 279.  ("You heard testimony from Mr. Parker, who testified earlier this morning.  His testimony should only be considered by you for the limited

- 15 -

purposes of identification of either Mr. Betts or the firearm. And you'll use the same criteria I gave you as to testimony and credibility.").

Based on the testimony, we conclude the trial court did not abuse its discretion in admitting the evidence at issue. The Commonwealth introduced the fact that Parker had observed Betts with the gun pursuant to the identity exception under Rule 404(b) to demonstrate that Betts had been seen in possession of the gun by another individual on a prior occasion. Defense counsel, albeit unintentionally, opened the door on the line of questioning, which led to the introduction of the statement that Betts had pointed the gun at Parker. There was no further testimony about why the gun was pointed at Parker. Lastly, as requested and agreed upon by defense counsel, the court gave a curative instruction to the jury.[9]

Therefore, based on the facts of this case, we find this prior possession incident was indicative of Betts's guilt, and the probative value of this prior bad acts evidence outweighed the risk of unfair prejudice. **See Talbert**, **supra**. Likewise, "[t]he law presumes juries follow a court's instructions." **Commonwealth v. Smith**, 131 A.3d 467, 475 (Pa. 2015), *cert. denied*,

---

[9] Although the admission of the evidence at Betts's second trial is procedurally similar to what occurred at the first trial, we emphasize the Commonwealth did not elicit the improper testimony, but rather, it came out inadvertently on cross-examination. Moreover, we note the introduction of the evidence was *de minimis* as Parker testified the gun was pointed at him, and did not testify that the gun was pointed at his head, as he did in the first trial. Furthermore, the court gave the instruction to the jury.

2016 U.S. Lexis 4608 [No. 15-9144] (U.S. Oct. 3, 2016). Accordingly, we conclude the trial court did not err when it permitted the evidence to be introduced and denied Betts's motion for a mistrial.

In his second claim, Betts argues the trial court abused its discretion by imposing an aggregate sentence of 21 to 42 years' incarceration, followed by 15 years' probation, because it was clearly unreasonable and manifestly excessive, as well as inconsistent with the protection of the public, the gravity of the offenses, and Betts's rehabilitative needs where the court imposed consecutive sentences on four counts. *See* Betts's Brief at 49. Moreover, he states given his "history and background and the mitigating circumstances of the offense itself, the application of the guidelines would be clearly unreasonable." *Id.* Furthermore Betts contends the trial court discounted certain mitigating factors: (1) he was a juvenile at the time of the offenses; (2) he had no significant criminal record; (3) he came from a disadvantageous family background that included physical abuse, and both of his parents had extensive criminal backgrounds; and (4) he has shown promise in his pre-sentence incarceration by earning his general education development ("GED") degree and did not receive any prison write-ups. *Id.* at 52.

As presented, Betts's issue challenges the discretionary aspects of his sentence. *See Commonwealth v. Lutes*, 793 A.2d 949 (Pa. Super. 2002) (explaining argument that sentence is manifestly excessive challenges

discretionary aspects of sentencing). The standard of review is well-established:

> Sentencing is a matter vested in the sound discretion of the judge, and will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa. Super. 2008) (citation omitted), *appeal denied*, 980 A.2d 607 (Pa. 2009).

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. Hoch*, 936 A.2d 515, 518 (Pa. Super. 2007) (citations and quotation marks omitted). To reach the merits of a discretionary issue, this Court must determine:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011) (footnotes omitted).

Here, Betts filed a timely notice of appeal and included the requisite statement pursuant to Pa.R.A.P. 2119(f) in his appellate brief.[10] Moreover, his post-sentence motion was timely filed.[11] Therefore, we may proceed to determine whether Betts has presented a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Commonwealth v. Edwards**, 71 A.3d 323, 330 (Pa. Super. 2013), *appeal denied*, 81 A.3d 75 (Pa. 2013).

With respect to whether an issue presents a substantial question, we are guided by the following:

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. **See Commonwealth v. Paul**, 2007 PA Super 134, 925 A.2d 825 (Pa. Super. 2007). "A substantial question exits only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Griffin**, 2013 PA Super 70, 65 A.3d 932, 2013 WL 1313089, *2 (Pa. Super. filed 4/2/13) (quotation and quotation marks omitted).

**Edwards**, 71 A.3d at 330 (citation omitted).

As indicated above, Betts claims his sentence is clearly unreasonable, manifestly excessive, and inconsistent with the Pennsylvania Sentencing Code, and that the court failed to consider the mitigating evidence he

---

[10] **See** Betts' Brief at 33-36.

[11] **See** Betts' Post-Sentence Motion, 5/21/2015.

presented. *See* Betts's Brief at 49. We find that such claims do raise a substantial question. *See Commonwealth v. Kelly*, 33 A.3d 638, 640 (Pa. Super. 2011) ("A claim that a sentence is manifestly excessive such that it constitutes too severe a punishment raises a substantial question."); *Commonwealth v. Perry*, 883 A.2d 599, 602 (Pa. Super. 2005) (concluding appellant raised a substantial question when he jointly claimed that a sentencing court imposed an excessive sentence and failed to consider substantial mitigating factors). Consequently, we will proceed to the merits of his claims.

We note that when imposing a sentence, the sentencing court must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). Moreover,

> "a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002), *appeal denied,* 582 Pa. 671, 868 A.2d 1198 (2005), *cert. denied,* 545 U.S. 1148, 125 S.Ct. 2984, 162 L.Ed.2d 902 (2005). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.* Where the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988). *See also Commonwealth v. Tirado*, 870 A.2d 362, 368 (Pa. Super. 2005) (stating if sentencing court has benefit of PSI, law expects court was aware of relevant information regarding defendant's character and weighed those considerations along with any mitigating factors).

- 20 -

***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super. 2010).

"[A]n appellate court may not disturb a sentence that is within the sentencing guidelines unless it determines that the sentence is 'clearly unreasonable.'" ***Commonwealth v. Bowen***, 975 A.2d 1120, 1126 n.5 (Pa. Super. 2009), *quoting* 42 Pa.C.S. § 9781(c).

> A sentence may be found unreasonable if it fails to properly account for [the] four statutory factors [listed in Section 9781[12]]. A sentence may also be found unreasonable if the "sentence was imposed without express or implicit consideration by the sentencing court of the general standards applicable to sentencing." These general standards mandate that a sentencing court impose a sentence "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b).

***Commonwealth v. Sheller***, 961 A.2d 187, 191 (Pa. Super. 2008), *appeal denied*, 980 A.2d 607 (Pa. 2009).

_____

[12] In making a reasonableness determination, Section 9781 states a court should consider the following four factors:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.

> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

> (3) The findings upon which the sentence was based.

> (4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d)(1)-(4).

Here, with respect to Docket No. 1004-2014, the trial court had the benefit of a presentence investigation report ("PSI"),[13] and therefore, we will presume it was "aware of all appropriate sentencing factors and considerations." *Commonwealth v. Downing*, 990 A.2d 788, 794 (Pa. Super. 2010) (citation omitted). At the original sentencing hearing on January 5, 2015, the court heard from the victim, Sergeant Durbin, and the impact the incident had on him. *See* N.T., 1/5/2015, at 4-6. Moreover, the court placed its reasons for the sentence imposed on the record.[14] *See id.* at 8 ("[B]ased on the testimony as well as the jury's verdict as well as the impact on the victim and society as a whole[.]").

Subsequently, at the May 14, 2015, sentencing hearing, with regard to Docket No. 3339-2013, the court heard from one of the officers that responded to the car chase. *See* N.T., 5/14/2015, at 3-4. The court indicated it again had the benefit of the PSI and its reasons for the sentence were based upon "the jury's decision on the charges that stems from the incident" as well as the PSI. *Id.* at 8.[15]

_____

[13] *See* N.T., 1/5/2015, at 2; N.T., 5/14/2015, at 8.

[14] We find the court's rationale at the original sentencing still stands because at the May 14, 2015, resentencing hearing, the court only merged the crimes of attempted criminal homicide and aggravated assault and did not alter other aspects of the sentence.

[15] We note "[a] sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence, ... the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character

*(Footnote Continued Next Page)*

Additionally, we note the trial court had the opportunity to observe Betts's behavior at both his two trials and sentencing hearing, and to hear his allocution at the May 14th sentencing. Betts apologized and took responsibility for his actions. *Id.* at 7.

Lastly, in its June 23, 2015, memorandum disposing of Betts's post-sentence motion, the court further explained its reasons for the sentence it imposed:

> [Betts] contends that his overall sentence is excessive and unreasonable and constitutes too severe a punishment in light of the gravity of the offense, what is needed to protect the public and his rehabilitative needs. [Betts] shot a member of the public multiple times causing grievous bodily injury. Several nights later, he engaged police officers from multiple districts in a high speed chase on a well-travelled highway. He crashed his vehicle, with occupants, into a police officer's vehicle.
>
> …
>
> [Betts's] issue appears to be that the sentence is manifestly unreasonable. [Betts] underestimates the gravity of his offenses and the danger he poses to the public. Through two trials, this court heard evidence of his actions putting others at risk. He was found guilty of attempted homicide as well as aggravated assault, both of which are extraordinarily violent and serious crimes. Beyond that, he put the lives of his friends in danger. He put the lives of every other driver on the road in danger. Two separate juries found him guilty of a number of crimes involving possession of a firearm when he was just 17 years old. The sentence handed down was in response to the gravity of his offenses and in response to the dangers he posed to the public at large. Our sentence specifically ordered [Betts] to continue his education and receive training that would help

_(Footnote Continued)_ ───────────

of the offender." ***Commonwealth v. Crump***, 995 A.2d 1280, 1283 (Pa. Super. 2010), *appeal denied*, 13 A.3d 475 (Pa. 2010).

him become a productive member of society when he is ultimately released. The sentence is proportionate to the crimes committed.

Trial Court Opinion, 6/23/2015, at 18-19.

Based on the above, our review of Betts's sentence, pursuant to Section 9781 of the Sentencing Code, leads us to conclude that the court imposed a reasonable and appropriate sentence. It is evident from the court's on-the-record statements, and in its June 23rd post-sentence memorandum, that it considered all the requisite factors, including the nature and circumstances of the offense, the recommended guideline range, the protection of the public, the gravity of the offense, and Betts's rehabilitative needs, when fashioning his sentence. Moreover, contrary to Betts's argument, it is clear from the court's statement that it did consider the mitigating circumstances surrounding the incident. Accordingly, we conclude the court properly exercised its discretion in sentencing Betts on both dockets. Therefore, his second issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2016