J-S48026-17

2018 PA Super 22

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :            PENNSYLVANIA
                                          :
             v.                       :
                                          :
                                          :
TODD FRANKLIN MCCARTHY      :
                                          :
           Appellant            :   No. 345 MDA 2017

Appeal from the Judgment of Sentence October 21, 2016
In the Court of Common Pleas of York County
Criminal Division at No(s):  CP-67-CR-0002433-2015

BEFORE:   OTT, J., STABILE, J., and PLATT*, J.

OPINION BY OTT, J.:                    **FILED FEBRUARY 06, 2018**

Todd Franklin McCarthy appeals from the judgment of sentence imposed on October 21, 2016, in the Court of Common Pleas of York County, following his jury convictions for theft by unlawful taking, access device fraud, and two counts of forgery.[1]  The trial court sentenced McCarthy to, *inter alia*, an aggregate term of 18 to 36 months' imprisonment (with 383 days' credit for time served), followed by 10 years' probation.[2]  In this appeal, McCarthy

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3921(a), 4106(a)(1)(ii), and 4101(a)(2), and (3), respectively.

[2] The trial court sentenced McCarthy to 18 to 36 months in prison with 383 days' credit for time served for his conviction for theft by unlawful taking.  The trial court imposed consecutive five-year sentences of probation for access device fraud and forgery, respectively.  On the second count of forgery, the trial court imposed a concurrent sentence of five years' probation.  Finally, the trial court ordered McCarthy to pay $90,000.00 in restitution to the estate of his mother, the victim.

challenges the trial court's denial of his motion to dismiss, the trial court's evidentiary ruling that allowed evidence regarding the value and condition of the victim's home, and the discretionary aspects of the sentence. Based upon the following, we affirm.

The criminal charges against McCarthy arose from McCarthy's actions of having his elderly mother, Mary Ann Miller (the "victim"),[3] sign blank checks that he made payable to himself, and obtaining money through ATM transactions using his mother's debit card. At the relevant time, McCarthy was his mother's agent under her power of attorney (POA). McCarthy was charged via a criminal complaint with the foregoing crimes on February 26, 2015. McCarthy was arrested on March 2, 2015, pursuant to a warrant issued on February 27, 2015. On August 10, 2015, at McCarthy's request, the trial court continued the case to October 16, 2015. On October 14, 2015, again at McCarthy's request, the trial court continued the case to December 7, 2015. On December 7, 2015, the parties agreed to list the case for the January 2016 term, which was to start on January 5, 2016, because the criminal court was not in session between December 7, 2015, and January 5, 2016. McCarthy was not tried in January 2016. The parties next appeared in court on July 25, 2016.[4] On that date, the trial court continued the case to the September 2016

_____

[3] Suffering from dementia, the victim passed away in March 2015.

[4] In the interim, and unrelated to the disposition of this case, the Commonwealth's only activity on the docket involved its filing of a motion *in limine* on June 14, 2016.

term.  In so doing, the trial court noted that "[g]iven the amount of time that the parties anticipate is required to resolve this case to complete the trial and the [c]ourt's schedule, which only has available court time today and tomorrow, we will continue this case and put it back on the September trial term[.]" Trial Court Order, 7/25/16.  On September 6, 2016, on the first day of the September 2016 term, the trial court granted the Commonwealth's request to move McCarthy's trial to the following week.

On September 9, 2016, McCarthy filed a Pa.R.Crim.P. 600 motion, seeking to dismiss with prejudice the charges filed against him.  McCarthy argued that the Commonwealth failed to bring him to trial within 365 days of the filing of the criminal complaint.  The trial court held a jury trial on September 12, 2016, which lasted two days.  At the start of trial, the trial court held a hearing on McCarthy's Rule 600 motion.  N.T. Trial, 9/12/16, at 4-5, 14-29.  Following the hearing, the trial court denied the motion. McCarthy proceeded to trial, at which he objected, on the basis of relevance, to the Commonwealth's introduction of evidence relating to the value and condition of the victim's house while McCarthy was in charge of her care.  The Commonwealth argued that it should be permitted to introduce such evidence for the following reasons:

> [T]he Commonwealth's case is just to show that the, in terms of the house, that the—that after the, [the victim] in this case had moved out of the house and then ultimately became deceased, and [McCarthy] was the only one living there, that he did nothing except allow it to go to waste.  He was not taking care of anything. He allowed the property to go to tax sale.  He allowed it to fall into ruin.  That at that point it was sold, it was sold for much less than the value, the assessed value of the house.

There are pictures, which I can hand up, showing the condition of the house. And it just goes to the overall circumstances. This is basically a circumstantial case, that [McCarthy] was wasting [the victim's] assets for his own benefit and doing nothing to take care of them, and that that, in turn, affected not only [the victim], but the rest of the heirs of the property.

N.T. Trial, 9/12/16, at 33-34. The trial court overruled McCarthy's objection.

At trial, the Commonwealth introduced the testimony of several witnesses, which the trial court summarized as follows:

During trial, Angie Walker[,] a social worker with Visiting Angels, testified that her agency provided personal care for [the victim], [McCarthy's] elderly mother, in her home. Because [the victim] had been diagnosed with dementia, Walker regularly assessed her mental health status. Tests conducted in late 2012 and early 2013, as well as visual observations, established that [the victim's] mental status was deteriorating rapidly and she could no longer manage her financial affairs.

In April 2013, Walker told [McCarthy] that [the victim] could no longer properly administer her medication. [McCarthy] was considering placing his mother in a residential facility. However, when he learned that the cost would not be covered by insurance, [McCarthy] decided against the private facility.

Barbara Kelch, a Visiting Angels worker, cared for [the victim] beginning in 2011. [The victim's] mental and physical health declined during this period. [McCarthy] lived in [the victim's] residence beginning in 2013. Initially [Mccarthy] would ask [the victim] for her bankcard to pay for household necessities and return it to her. Later, however, [McCarthy] controlled [the victim's] finances. [The victim] occasionally complained that "[h]e's spending my money." [McCarthy] frequently left [the victim] alone and took her car to travel to the White Rose Bar and Grill. [McCarthy] did not perform household tasks.

Susan Heinle, president of Visiting Angels, testified that [the vicitm's] daughter had had power of attorney and made regular payments to Visiting Angels. When [McCarthy] assumed responsibility for [the victim's] finances, the "payments were sporadic" and often weeks late. Visiting Angels "would have to send repetitive notices, and . . . threaten that we were going to put services on hold unless we received payment." When Visiting Angels stopped services, the business "repeatedly tried to get payment for that final balance, without success." In addition, real estate taxes on [the victim's] residence were "delinquent."

Megan Schrom, administrator at Rest Haven Nursing Home, testified that [the victim] began residing at the home in February 2014. Although [McCarthy] had told staff members that "there were adequate funds, money was not an issue," he failed to pay bills. Despite repeated attempts to communicate with [McCarthy], close to $60,000 in charges from Rest Haven remained unpaid. Eventually, Rest Haven executives took the unusual step of visiting [the victim's] residence. However, [McCarthy] refused to answer the door. Schrom noticed that the exterior of the residence and surrounding area were "really disgusting" and "there were multiple notices on the door." In addition, the physical condition of the residence was "dingy, dirty" and it "[l]ooked like it was going to fall down." Prior to [McCarthy's] residence, the home had been well-maintained.

Despite receiving no payment, Rest Haven continued to care for [the victim] until she died in March 2015. Rest Haven officials contacted the Area Agency on Aging Protective Services with their concerns.

Other than when [the victim] was first admitted to Rest Haven in February 2014, Schrom knew of no contact between [McCarthy] and [the victim] before her death more than a year later. Rest Haven could not reach [McCarthy] to fill out routine forms and [McCarthy] failed to attend meetings with staff to discuss [the victim's] care.

Sue Gordon, a protective service investigator with the Office on Aging, testified she became involved in [the victim's] case because "[b]ack taxes hadn't been paid on her home . . . there were unpaid bills to the nursing home, to in-home care services . . . and nobody was able to get ahold of [McCarthy]." Gordon identified documents that established [McCarthy] had power of attorney over his mother's affairs. Under a power of attorney, "you are supposed to keep your funds separate from the client's and manage those monies just in the best interest of the client." As a fiduciary, [McCarthy] was required to "act in the client's best interest" and use [the victim's] funds for [the victim].

In investigating the agency's concerns, Gordon attempted to interview [the victim] but "she was extremely confused, was on total care, and was bed bound at that point."

[The victim's] bank records showed numerous debit transactions at the White Rose as well as transactions for cash. Both direct and circumstantial evidence established that [McCarthy] conducted the transactions.

A retired industrial engineer, [the victim] had income from social security, an investment account, a pension, a life insurance policy, and rental property. During the time [McCarthy] had power of attorney, substantial sums were transferred from these accounts and moved to an account accessible by a debit card. The investigation determined that in August 2014 alone, 93

withdrawals totaling more than $10,000 were made for purchases that were not for [the victim]. Conservatively, monies improperly taken from the [the victim's] accounts and spent largely at the White Rose totaled more than $65,000 in nine months.

In an interview with police, [McCarthy] admitted that checks written for [the victim's] care were made out and signed by him as power of attorney; whereas he had [the victim] sign blank checks that he made payable to him. Checks he made payable to himself included a check for his new car. This occurred during the period when [the victim's] dementia had progressed to the point that she did not know the month or day. During an 11-month period, [McCarthy] wrote checks totaling close to $25,000 that were made payable to him. During the next several months, [McCarthy] obtained money through ATM transactions using [the vicitm's] debit card. Together, the value of the transactions was more than $90,000.

An attorney for [the victim's] estate testified that in addition to [McCarthy], [the victim] had five other beneficiaries. [The victim's] residence, which had been assessed at $104,650, sold for $57,500.

[McCarthy] testified that he believed his mother was "okay" with him using her funds for personal purchases. He said it was "basically procrastination" that caused him to fail to pay her bills. He "went off the deep end" when his mother went to the nursing home. He failed to visit his mother because he "felt that it was best if we kind of just left it go." He was in a "deep depression . . . to the point where having that and my troubles with alcohol that I could only get up and go to the White Rose . . . ."

Trial Court Opinion, 4/5/17, at 6-12 (record citations omitted). The jury found McCarthy guilty of theft by unlawful taking, access device fraud, and two counts of forgery. On October 21, 2016, the trial court sentenced McCarthy as stated above. Following the denial of McCarthy's post-sentence motions on January 27, 2017, this timely appeal was filed.[5]

We restate the issues raised in McCarthy's brief verbatim:

_____

[5] McCarthy timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

- 6 -

Whether the Commonwealth violated Rule 600 where, under proper start- and end-dates and with accurate date-to-date calculations, it delayed a minimum of 367 days before bringing Todd McCarthy to trial, and also moved for a continuance instead of transferring the case to an available judge even after 367 days' delay.

Whether the trial court erroneously allowed voluminous evidence on the condition and value of [the victim's] house to show McCarthy was "wasting assets" where this was irrelevant and prejudicial in a very close case.

Whether the trial court improperly penalized McCarthy for exercising his constitutional rights to take his case to trial and maintain his innocence where the court imposed an aggravated-range sentence after explicitly citing McCarthy's failure to "take responsibility" despite counsel's statement that he accepted the verdict and intended to make the estate whole.

McCarthy's Brief at 4.

Regarding McCarthy's first issue, our standard of review for Rule 600 claims is an abuse of discretion. **Commonwealth v. Watson**, 140 A.3d 696, 697-698 (Pa. Super. 2016), *appeal denied*, 164 A.3d 480 (Pa. 2016). It is well-settled:

Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review . . . is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate

- 7 -

the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters . . ., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

**Watson, supra** (citation omitted).

Rule 600 provides in relevant part:

(A) Commencement of Trial; Time for Trial

(1) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

(2) Trial shall commence within the following time periods.

(a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

. . . .

(C) Computation of Time

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

. . . .

(3)(a) When a judge or issuing authority grants or denies a continuance:

(i) the issuing authority shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance; and

(ii) the judge shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance. The judge also shall record to which party the period of delay caused by the continuance shall be

attributed, and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with this rule.

Pa.R.Crim.P. 600.[6]

"Rule 600 requires the Commonwealth to try a defendant within 365 days of the filing of the complaint." ***Commonwealth v. Roles***, 116 A.3d 122, 124 (Pa. Super. 2015), *appeal denied*, 128 A.3d 220 (Pa. 2015).

For purposes of determining the time within which trial must be commenced pursuant to paragraph (A), paragraph (C)(1) makes it clear that any delay in the commencement of trial that is not attributable to the Commonwealth when the Commonwealth has exercised due diligence must be excluded from the computation of time. Thus, the inquiry for a judge in determining whether there is a violation of the time periods in paragraph (A) is whether the delay is caused solely by the Commonwealth when the Commonwealth has failed to exercise due diligence. If the delay occurred as the result of circumstances beyond the Commonwealth's control and despite its due diligence, the time is excluded. In determining whether the Commonwealth has exercised due diligence, the courts have explained that due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort.

Delay in the time for trial that is attributable to the judiciary may be excluded from the computation of time. However, when the delay attributable to the court is so egregious that a constitutional right has been impaired, the court cannot be excused for postponing the defendant's trial and the delay will not be excluded.

Pa.R.Crim.P. 600, cmt. (citations, quotation marks and brackets omitted).

"The Commonwealth has the burden of establishing by a preponderance of the evidence that it exercised due diligence throughout the prosecution." ***Roles***, 116 A.3d at 125.

---

[6] Effective July 1, 2013, our Supreme Court adopted a new Rule 600, which reflected prevailing case law. ***See*** Pa.R.Crim.P. 600, cmt.

Before we address the merits of McCarthy's claim that the Commonwealth failed to bring him to trial within 365 days from the filing of the criminal complaint, we highlight certain points relevant to the Rule 600 computation. First, the criminal complaint was filed on February 26, 2015, and, therefore, the mechanical run date for purposes of Rule 600 was 365 days after the complaint was filed, *i.e.*, February 26, 2016. Second, McCarthy's trial commenced on September 12, 2016, 199 days beyond the mechanical run date. Therefore, to determine whether a Rule 600 violation occurred here, we must determine only whether sufficient excludable time existed.

Upon review of the record, we agree with the trial court's analysis of the relevant periods of excludable time, but we find the trial court made incorrect calculations. Therefore, we proceed to our own calculations.

Under Rule 600, the start date for a prompt trial calculation is the date on which the criminal complaint is filed. *See* Pa.R.Crim.P. 600(A)(2)(a) (requiring that a trial must commence "within 365 days from the date on which the complaint is filed"). Here, using the date of the filing of the complaint as the start date and the September 12, 2016 trial date as the end date for purposes of Rule 600, we calculate 564 days from the filing of the complaint, i.e., 199 days beyond the 365-day requirement of Rule 600.

The trial court correctly determined, as did the parties, that the 148-day period between August 10, 2015 and January 5, 2016 was excludable based upon defense continuances. *See* Trial Court Opinion, 4/5/2017, at 5;

McCarthy's Brief at 28-29; Commonwealth's Brief at 17. As a result, 148 excludable days subtracted from the 564 total days yields 416 days, or 51 days in excess of the 365-day requirement of Rule 600.

The trial court also correctly determined that the 49-day period between July 25, 2016, and the September 12, 2016 disposition of McCarthy's Rule 600 motion, which coincided with the start of his trial, was excludable. We agree. The delay occasioned between July 25, 2016 and September 12, 2016, resulted from the unavailability of time on the trial court's calendar. *See Commonwealth v. Mills*, 162 A.3d 323, 325 (Pa. 2017) (noting that "where a trial-ready prosecutor must wait several months due to a court calendar, the time should be treated as "delay" for which the Commonwealth is not accountable"). Therefore, subtracting the 49 days between July 25, 2016, and September 12, 2016, from the 416 days, brings us to 367 days, *i.e.*, two days by which the Commonwealth exceeded the 365-day requirement of Rule 600.

In other words, from February 26, 2015, when the criminal complaint was filed to August 10, 2015, when McCarthy requested his first continuance, 165 days elapsed. From January 5, 2016 to July 25, 2016, an additional 202 days elapsed. Consequently, the net elapsed time is 367 days, which exceeds by two days the maximum 365 days permitted by Rule 600(A)(2)(a).

Nevertheless, we conclude that no Rule 600 violation occurred because the 365th day fell on a Saturday, and consequently and necessarily, Day 367 fell on a Monday. It is settled that "[w]henever the last day of any such period

(of time referred to in a statute) shall fall on a Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation." 1 Pa.C.S. § 1908. *See* Pa.R.Crim.P. 600, cmt. ("When calculating the number of days set forth herein, see the Statutory Construction Act, 1 Pa.C.S. § 1908.") *See also Commonwealth v. Sanford*, 441 A.2d 1220, 1221-1222 (Pa. 1982) (applying Section 1908 of the Statutory Construction Act to prompt trial calculation).[7] Accordingly, consistent with Section 1908 of the Statutory Construction Act and *Sanford*, we conclude that the trial court did not abuse its discretion in denying McCarthy's Rule 600 motion.[8] Therefore, McCarthy's first claim fails to warrant relief.

McCarthy next claims the trial court abused its discretion in allowing the Commonwealth to introduce evidence of waste by discussing the condition and value of the victim's house, while McCarthy was in charge of the victim's care. Specifically, McCarthy contests the trial court's admission of evidence that, through McCarthy's action or inaction, the value and condition of the victim's house had diminished while McCarthy cared for the victim. McCarthy maintains evidence of waste was not relevant to establish the underlying charges of theft by unlawful taking, access device fraud, or forgery.

---

[7] The *Sanford* Court applied Pa.R.Crim.P. 1100, the former version of Rule 600.

[8] Although our reasoning differs from that of the trial court, we may affirm for reasons other than those given by the trial court. *See Commonwealth v. Claffey*, 83 A.3d 780, 790 n.5 (Pa. Super. 2013).

The Commonwealth counters that the trial court did not abuse its discretion in this regard because the evidence of the value and condition of the victim's house is relevant to show McCarthy's criminal intent with respect to the crimes of theft of unlawful taking, access device fraud, and forgery. The Commonwealth reasons that the value and condition of the victim's house establishes that McCarthy "was wasting [the victim's] assets for his own benefit and doing nothing to take care of them which in turn affected not only [the victim], but also the heirs of her assets." Commonwealth's Brief at 20.

In reviewing McCarthy's argument, we are guided by the following legal principles.

> [T]he admissibility of evidence . . . rests within the sound discretion of the trial court, and therefore, we "will reverse [the] trial court's decision . . . only if the appellant sustains the 'heavy burden' to show that the trial court has abused its discretion."
>
> ****
>
> It is not sufficient to persuade the appellate court that it might have reached a different conclusion[;] it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion [that] overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015) (citations omitted).

Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 952 A.2d 594, 602 (Pa. 2008). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than

it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401; *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002). "Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403; *see Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012) (stating that even when evidence meets the relevance requirements, "such evidence may still be excluded where its probative value is outweighed by the danger of unfair prejudice.").

> However, [e]vidence will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case. . . . This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]

*Kouma*, 53 A.3d at 770 (citation omitted); *see* Pa.R.E. 403, cmt. (defining "unfair prejudice" as "a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.").

At trial, the Commonwealth sought to introduce testimony and photographs to show that after McCarthy's mother was placed in a nursing home, McCarthy was the only one living in her house, and he "allowed [the house] to go to waste," to the point that it sold for much less than its assessed

value. N.T., 9/12–14/2016, at 33. McCarthy's attorney objected, contending "none of that is relevant to the case at hand," and "[a]ny issues pertaining to the house, the value of the house, the value of the estate … should be in Orphan[s'] Court, should be civil matters." N.T., 9/12-14/2016, at 31.

The trial court overruled the objection, finding "[t]he photographs of the house … go to support the Commonwealth's circumstantial evidence that Mr. McCarthy was wasting the assets of his mother's house for his mother's purposes as well as for the other heirs' purposes, so I think that goes to his intent. We will rule they are admissible." N.T., 9/12-14/2016, at 35. *See* *also id.* at 260-261. In its opinion, the trial court reiterated:

> [McCarthy's] defense, in part, was that his mother authorized him to spend her money and that he lacked criminal intent. *See* N.T., 296-305. Evidence that [McCarthy] failed to maintain the house was circumstantial evidence that tended to show [McCarthy's] intent towards his mother and his mother's assets.

Trial Court Opinion, 4/5/2017, at 23. We find no abuse of discretion.

While, as trial counsel argued, McCarthy's failure to properly discharge his duties under the POA is a breach of fiduciary duty and is an orphans' court matter, we agree with the trial court that the evidence that McCarthy failed to maintain the value and condition of his mother's house was relevant and admissible in his criminal trial.

McCarthy was brought to trial on charges of theft by unlawful deception, access device fraud and forgery (two counts). Theft by unlawful taking is defined as follows: "A person is guilty of theft if he unlawfully takes, or

exercises unlawful control over, movable property of another with the intent to deprive him thereof." 18 Pa.C.S. § 3921(a). A person commits the offense of access device fraud if he: "uses an access device to obtain . . . property or services with knowledge that . . . access device was issued to another person who has not authorized its use." 18 Pa.C.S. § 4106(a)(1)(ii). Lastly, forgery is defined as follows:

> (a) . . . . A person is guilty of forgery if, with intent to defraud or injure anyone, or with knowledge that he is facilitating a fraud or injury to be perpetrated by anyone, the actor:
>
> . . .
>
> (2) makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another who did not authorize that act, or to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when no such original existed; or
>
> (3) utters any writing which he knows to be forged in a manner specified in paragraphs . . . (2) of this subsection.

18 Pa.C.S. § 4101(a)(2), and (3). As these statutory definitions indicate, the charges against McCarthy involve, *inter alia*, the deprivation or the taking of property from another without authorization.

With respect to the above crimes, the Commonwealth alleged McCarthy used his mother's debit card to pay his own expenses, amounting to more than $65,000.00 and, without using the POA, had his mother sign blank checks that he made payable to himself in various amounts, totaling almost

$25,000.00.[9]  The challenged evidence that MCCarthy failed to maintain the value and condition of the victim's home is relevant to the issue of McCarthy's intent to deprive the victim of her property.  The assessed value of the victim's house was $104,650.00, and, it sold for $57,500.00 after the victim's death.  **See** N.T., 9/12-14/2016, at 261–262.  These figures show McCarthy deprived his mother of almost half the value of the house, making the full value of that asset unavailable to her in the event she ran out of funds while at the nursing home.

Viewed in the context of all the evidence presented by the Commonwealth, with primary focus on the evidence showing that it was McCarthy's failure to pay the victim's nursing home bills that triggered the investigation leading to these charges, McCarthy's failure to maintain the value and condition of the victim's house is relevant for the light it sheds on McCarthy's intent in using the victim's credit card and directing the victim to sign blank checks he made payable to himself.[10]

_____

[9] **See** Commonwealth Exhibits 53–64.  Commonwealth Exhibit 54, a check that was payable to Diamond Auto of York and signed by the victim, was for a car that McCarthy bought for himself.  **See** N.T., 9/12-14/2016, at 243.
[10] The $47,150.00 loss in value of the victim's home (the difference between the assessed value of $104,650.00 and the $57,500.00 sale price), in combination with the approximately $25,000.00 from the victim's checks McCarthy made payable to himself, and the $65,000.00 McCarthy spent using the victim's debit card, certainly goes to McCarthy's intent to deprive the victim of her property.

Furthermore, the evidence is not outweighed by a danger of unfair prejudice. Pa.R.E. 403. The testimony and photographs conveyed to the jury a house that was poorly kept and in poor condition – nothing more.[11] Although McCarthy asserts he was prejudiced by the evidence because it "inject[ed] [the victim's] other heirs into the case as additional victims, and show[ed] McCarthy had let [the victim's] house become 'really disgusting,'"[12] we are not persuaded this evidence rises to such level that would "tend[] to suggest a decision on an improper basis or divert the jury's attention." Pa.R.E. 403, cmt. The fact that this evidence was harmful to McCarthy does not provide a valid basis for exclusion. **See Kouma, supra**, 53 A.3d at 770 ("[e]vidence will not be prohibited because it is harmful to the defendant … This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]") (citation omitted). Therefore, we reject McCarthy's claim that this evidence was unfairly prejudicial, and conclude the jury was properly permitted to look at and hear the evidence of waste and draw its own inferences. Accordingly, based on the above discussion, McCarthy's second argument fails.

McCarthy's final issue is a challenge to the discretionary aspects of sentencing. Specifically, McCarthy contends:

---

[11] The trial court did exclude one photograph of a bathtub with blood as "unduly inflammatory." N.T., 9/12-14/2016, at 31, 35.

[12] McCarthy's Brief at 40, *citing* N.T., 9/12-14/2016, at 172.

The trial court gave McCarthy a sentence in the aggravated range, after explicitly citing his failure to "take responsibility" as aggravation. The context of the hearing indicates the court thus penalized McCarthy for exercising his constitutional rights to take the case to trial and maintain his innocence.

McCarthy's Brief at 51 ("Section 2119(f) Statement) (record citations omitted).

Our Court has explained:

"Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." Before we address such a challenge, we first determine:

(1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

***Commonwealth v. Rush***, 162 A.3d 530, 543 (Pa. Super. 2017) (citations omitted), *appeal denied*, ___ Pa. ___ (September 15, 2017).

Here, McCarthy has complied with the procedural requirements for this appeal by filing a timely post-sentence motion for reconsideration of sentence and timely notice of appeal, and by including in his appellate brief a statement of reasons relied upon for appeal pursuant to ***Commonwealth v. Tuladziecki***, 522 A.2d 17 (Pa. 1987), and Pa.R.A.P. 2119(f). Furthermore, McCarthy's claim presents a substantial question. ***See Commonwealth v. Bowen***, 975 A.2d 1120, 1122 (Pa. Super. 2009) (defendant's contention that

his sentence "was based on an unconstitutional factor … raises a substantial question for our review"). Therefore, we proceed to the merits.

Our standard of review is well settled:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Grays***, 167 A.3d 793, 816 (Pa. Super. 2017) (citation omitted).

Furthermore, because McCarthy was sentenced within the aggravated range of the sentencing guidelines, this Court may only vacate his sentence if this "case involves circumstances where the application of the guidelines would be clearly unreasonable[.]" 42 Pa.C.S. § 9781(c)(2).

At sentencing, the trial court stated:

… I do not take into consideration the fact that you went to trial in this matter. You have an absolute constitutional right to do that. I can't and don't hold that against you.

I do, however, agree with [the Assistant District Attorney's] statements that you have not accepted responsibility in this case, and I do consider that an aggravating factor.

N.T., 10/21/2016, at 17. McCarthy argues that the trial court improperly aggravated his sentence "because he exercised his right to trial and did not concede guilt at sentencing." McCarthy's Brief at 53.

- 20 -

We find no merit in this argument as the trial court cited numerous legitimate factors to justify its aggravated range sentence. ***See Bowen, supra***, 975 A.2d at 1127–1128 (holding silence at sentencing may not form the basis of finding that a defendant failed to take responsibility for his crimes, and silence at sentencing may not be the sole basis for finding that a defendant lacked remorse; however, remand for resentencing was not necessary because trial court cited other aggravating factors).

As the trial court explained in its opinion:

The trial court acknowledged that [McCarthy's] prior record score was zero. What the trial court looked to, however, were [McCarthy's] criminal convictions that were not included in the prior record score calculation. Specifically, in 2009, [McCarthy] was placed on the Accelerated Rehabilitative Disposition program for driving under the influence; in 2011, he was placed on probation following a conviction for recklessly endangering; and in 2013, he was sentenced to 90 days to six months for a second offense of driving under the influence. Moreover, in 2014 — after [McCarthy] committed the offenses that resulted in the convictions at issue — he was convicted of fleeing and eluding, driving under the influence, driving under suspension, accidents involving damage to unattended property, and driving without insurance.

Thus, although [McCarthy's] prior record score is zero, this designation does not adequately reflect a significant history of alcohol-related offenses. [McCarthy] was afforded the rehabilitative resources of the criminal justice system but failed to correct his criminal conduct. Moreover, even after he committed the instant offenses and was under investigation, he remained undeterred and both drove while intoxicated and fled from police.

[McCarthy] also contends that the trial court erroneously considered that [McCarthy] was neglecting Miller. The trial court did not find that [McCarthy] physically abused Miller. Rather, the trial court considered that the elderly victim was vulnerable and [McCarthy] took full advantage of her reduced mental and physical

state to unlawfully misappropriate the funds she had set aside for her retirement. This was at the expense of paying Rest Haven, Visiting Angels, and York Hospital for her care and also at the expense of performing routine maintenance of her residence, thus diminishing its resale value. Moreover, [McCarthy's] apparent motive for what the trial court deemed to be callous treatment of his mother was to purchase and consume large quantities of alcohol.

Finally, [McCarthy] contends that the trial court improperly found that "he had not properly treated his alcohol problems despite a lengthy period of sobriety and counsel's explanation that he postponed treatment only due to the timing of the trial." It was undisputed that [McCarthy] failed to follow through with the recommendations stemming from a Drug and Alcohol Evaluation. He attempted to justify this failure but the fact remained that [McCarthy] could have complied with the treatment recommendation and did not. The trial court properly considered this fact to bear on [McCarthy's] rehabilitation, recidivism risk, and ability to conform his behavior to the requirements of the law.

In summary, the trial court weighed a number of factors that it properly considered to be aggravating and placed on the record its reasons for imposing a sentence in the aggravated range.

Trial Court Opinion, 4/5/2017, at 24–27. Based on our review of the notes of testimony of the sentencing hearing, we find no abuse of discretion. The trial court's sentence, which falls within the sentencing guidelines, is not "clearly unreasonable." 42 Pa.C.S. § 9781(c). Accordingly, we reject McCarthy's discretionary aspects of sentencing claim.

Judgment of sentence affirmed.

Judge Platt joins the opinion.

Judge Stabile files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/06/2018